## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CST INDUSTRIES, INC.,**

      **Plaintiff,**

      **v.**

**TANK CONNECTION, L.L.C. et al.,**

      **Defendants.**

**Case No. 23-2339-JAR-RES**

## <u>MEMORANDUM AND ORDER</u>

This case involves two business rivals seeking to become the roof subcontractor for a large municipal project involving the City of Richmond, Virginia's drinking water reservoir. Plaintiff CST Industries, Inc. ("CST") brings claims against its competitor, Tank Connection, L.L.C. ("Tank"); as well as Tank's Liquid Market Manager, Jordan LaForge; and the general contractor for the project, Crowder Construction, Inc. ("Crowder"). CST's Amended Complaint alleges the following claims for relief: (1) tortious interference with contract against Tank and Crowder; (2) violations of the Defend Trade Secrets Act ("DTSA") against Tank and Crowder; (3) tortious interference with business expectancy against Tank and LaForge; (4) civil conspiracy against Tank and Crowder; (5) aiding and abetting against Tank Connection and Crowder; and (6) unfair competition against all Defendants.[1]

Before the Court is CST's Motion for Preliminary Injunction (Doc. 64). The Court held an evidentiary hearing on this motion on March 11 and 12, 2024. Having fully considered the briefs and the evidence presented at the hearing, the Court is prepared to rule. As described more fully below, the Court denies CST's motion for preliminary injunction.

---

[1] Doc. 38.

## I.      Preliminary Injunction Standard

Fed. R. Civ. P. 65(a) authorizes the Court to issue a preliminary injunction.  A preliminary injunction "is an extraordinary remedy," so "the right to relief must be clear and unequivocal."[2]  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[3]  This standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."[4]  The Court makes the following findings of facts and conclusions of law under Fed. R. Civ. P. 52(a)(2) in support of its decision to deny CST's motion for preliminary injunction.[5]

## II.     Facts

### *The Byrd Park Project*

The facts of this case relate to the City of Richmond, Virginia's ("the City") choice of subcontractor for the design, manufacture, and installation of the roof for a 55-million-gallon drinking water reservoir ("Byrd Park Project").  The Byrd Park Project involved rehabilitating two large water tanks; the general contractor was required to demolish the concrete covers on both, rehabilitate the tanks, and then put new roofs on each.  The City specified that the

---

[2] *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

[3] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[4] *Id.* at 21.

[5] *See Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 890 n.3 (10th Cir. 2013) ("The district court identified the harms it thought salient, attributed weight to them, and concluded that the balance did not favor granting an injunction.  This is sufficient and consonant with the well-settled principle that the district court 'need only make brief, definite, pertinent findings and conclusions upon the contested matters.'" (quoting *OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1204 (10th Cir. 2007))).

reservoirs must utilize a triangulated, rectangular, flat, column-supported roof system—a unique roof design in the industry.

Crowder submitted a bid to be the general contractor for the Byrd Park Project in March 2022; it was one of the City's prequalified bidders.  The City's Invitation to Bid indicated it would award the contract to the "lowest, responsive, responsible" bidder.[6]  It also indicated that the general contractor was not precluded "from requiring each Subcontractor to furnish a Performance Bond and a Payment Bond with surety thereon in the sum of the full amount of the contract with such Subcontractor."[7]

Crowder could not self-perform the roof design, manufacture, and installation, so it required a subcontractor.  In her request to the Crowder Board of Directors for permission to bid on the project, Crowder CEO Lynn Hansen estimated it would be a $57,000,000 project.  Hansen identified as a risk the fact that the "Aluminum Cover subcontractor is basically ½ of project."[8]  There was never a question in Hansen's mind that this risk required Crowder to obtain a payment and performance bond ("P&P bond") from the roof subcontractor.  This was in line with Crowder's general policy to ask for a bond for any subcontract over $1 million.

### CST's Spring 2022 Bid

CST is an industry leader in the manufacture and construction of factory-coated metal storage tanks and silos, aluminum domes, and specialty covers.  It was one of three roof subcontractors prequalified by the City to work on the Byrd Park Project.  CST had engineering and installation experience with the triangulated, rectangular, flat-column supported roof structures required for the project, having built approximately twelve such structures before the

---

[6] Ex. 1200 §§ 2.2.4, 2.7 .

[7] *Id.* § 4.6.1.

[8] Ex. 1203 at 2.

Byrd Park Project.  CST previously helped the City and its engineers write the roof specifications for the project.  CST also completed an earlier project for the City in 2010.

Jim Chastain was an independent, outside sales broker with Heywood Associates, who worked on commission for CST on the Byrd Park Project.  It is standard practice in the industry for brokers like Chastain to negotiate with the general contractor estimators on "bid day" —the day the bid is due—to determine a final price for the estimator to use when formulating their own bids.  Crowder understood that Chastain acted with authority on behalf of CST when Crowder negotiated with him during the bidding process.

Chastain emailed CST's initial subcontract proposal to Crowder on March 10, 2022.  CST's proposal to Crowder and other bidding general contractors dated March 15, 2022, was for a "triangular space frame (geodesic) aluminum cover system."[9]  The bid explicitly stated it did not include a "P&P bond."[10]  The bid included the following terms of payment: 30% when the Order is placed by the Purchaser, 30% when the order is "released to the shop for fabrication," and 40% "upon receipt of invoice at shipment, or if shipment is delayed by the purchase, after completion of order."[11]

On bid day, Chastain sent Randy Damm, Crowder's estimator, a revised proposal.  In this March 17, 2022 email, Chastain sent the revised proposal from CST, and highlighted in his email some "key points," including: "A Payment & Performance bond underwritten by Lockton will be provided in the contract amount, and the cost is included in CST price."[12]  Damm, responded in part that despite this language in the email, with respect to the attached revised proposal: "CST

---

[9] Ex. 95 at 1.

[10] *Id.* at 2.

[11] *Id.* at 2–3.

[12] Ex. 1205 at 2.

scope still shows the exclusion of a P&P bond.  Please confirm that it will be included in their price as outlined in your notes below."[13]  Chastain responded, "Sorry about that.  Payment & Performance Bond is included in the CST price.  Should have removed this exclusion."[14]  CST's final bid price confirmed by Chastain was $25,495,000.

### Tank's Spring 2022 Bid

In addition to CST's bid, Crowder received bids from UIG and Tank before its own bid was due.  Since Tank was not prequalified, it submitted an "or equal" bid.  An "or equal" bid means that despite not being prequalified, Tank sought to be considered based on experience with similar projects.

Tank is a 20-year-old company that manufactures and installs aluminum geodetic domes, bolted tanks, and flat covers.  Tank wanted to expand its aluminum cover business in July 2021 when it learned about the Byrd Park Project, so Tank saw it as an opportunity to expand that business and add to its portfolio.  However, Tank was aware of the City's specification that required the roof manufacturer to have "at least five U.S. installations of the type being proposed, each with a minimum of five years of satisfactory service."[15]  Tank understood that it did not have the necessary existing portfolio as required by the City to win the bid.

Despite not having the requisite five prior installations, Jeff Burke, Tank's Director of Sales, testified that he believed Tank was qualified to work on the project because it had worked on a similar design for a project in Saudi Arabia that used concrete instead of aluminum

---

[13] *Id.* at 1.

[14] *Id.*  The version attached to Crowder's response to the motion for preliminary injunction is in color and makes clear that this language was inserted in red by Chastain to Damm's questions in his earlier email.  *See* Doc. 95-2.

[15] Ex. 877 at Bates 418.

columns.  Tank understood that if it tried to bid on the Byrd Park Project, it would have taken

considerable resources away from its engineering group focused on aluminum geodetic domes.

Tank hired Steven Ducotey in November 2021.  Ducotey previously worked for

Conservatek, which was purchased by CST in 2011.  Ducotey worked as a design engineer, then

a department manager, and eventually became CST's Vice President of Engineering.  He had

hands-on experience with projects involving flat covers and domes while at CST.  Ducotey

signed a Confidentiality and Non-Competition Agreement with CST, and its subsidiaries,

Conservatek and Temocor, on April 22, 2011.[16]  It required him to maintain the confidentiality of

CST's confidential and proprietary information during and after his employment.  It contained a

two-year non-competition provision.  Ducotey understood that he continued to be bound by the

confidentiality provisions of that agreement, and that confidential information included bids and

project information that was not public.  Ducotey left CST in 2016 after 31 years due to changes

in management and in his responsibilities.

By the time Ducotey joined Tank, Casey Whalen was working there too.  Whalen

previously worked for CST and Conservatek as a project manager for 25 years.  After Tank hired

Ducotey, it decided to submit an "or equal" bid on the Byrd Park Project and leverage Whalen's

and Ducotey's past experience with CST and Conservatek in order to overcome its lack of prior

experience with triangulated, rectangular, flat, column-supported roof systems.  On March 16,

2022, Tank submitted its "or equal" bid.[17]  In the pricing summary section of the bid, it stated:

"Payment and Performance Bonding is applicable at $20/$1000 and will be provided in phases

(is billable as an adder)."[18]  Tank attached to its proposal a "Summary of Experience" for both

---

[16] Ex. 27.

[17] Ex. 815.

[18] *Id.* at Bates 43.

Whalen and Ducotey.  In the synopsis for each, it states that their experience includes the respective years they worked with Conservatek and CST.  Under Ducotey's "Accomplishments," he lists several projects he worked on while at CST and Conservatek.  For example, he states that he "[d]esigned Conservatek's first low-profile column supported dome roof."[19]  Each Summary then includes photographs of projects, with captions naming them, but without attributing them to CST.  Similarly, Whalen's Summary of Experience provides a "[s]hort list of completed Projects," and photographs of CST projects without attribution in the captions.[20]

### *Crowder's Selection and Post-bid Negotiations*

Despite CST submitting the bid with the highest price, when Crowder submitted its own bid to the City on March 17, it selected CST as the subcontractor for the design, fabrication, and installation of the water tank covers.  Crowder chose CST in large part because it could fully bond the project.  UIG, the other prequalified bidder, could only bond 50% of the project, and Crowder was concerned about winning the bid using Tank, which was not a prequalified roof subcontractor.  Without full bonding, Hansen testified that the project would be a risk to Crowder.  In fact, Hansen testified that if Crowder had not found a roof subcontractor willing to fully bond the project, it may not have bid on the project at all.

CST and Crowder continued to negotiate the subcontract price in a series of emails in June 2022 using Chastain as an intermediary.  By this point, Chris Robards was in charge of overseeing the project for Crowder, including the contract negotiation.  Robards testified that during this process, CST represented multiple times that it would provide a full bond, including by naming the bonding company.  For example, on June 30, 2022, Tim Kempf, the Director of

---

[19] *Id.* at Bates 66.

[20] *Id.* at Bates 60–65.

Sales at CST, explained why CST's payment structure required such a high percentage up front.

One "additional cost and consideration" Kempf listed in that email was "Bond costs and fees."[21]

On July 27, 2022, Crowder issued a Letter of Intent ("LOI") to CST, stating that Crowder intends to issue a subcontract to CST for the triangulated, aluminum, flat roof system on the Byrd Park Project. The LOI includes the following language:

> This Subcontract is contingent upon completion and approval of Crowder's Subcontract Prequalification, material and equipment approval by the Owner and Engineer, and mutually agreed upon terms and conditions. . . . By the authority of this letter, CST . . . is hereby directed to immediately commence with shop drawings on this order.[22]

CST followed the directive in the LOI and began the design process for the project.

Sometime in the fall of 2022, the City accepted Crowder's bid to be the general contractor on the Byrd Park Project. Once their contract was signed, "the clock was ticking" for Crowder because the contract required a completion date 1,580 consecutive calendar days after Crowder received a Notice to Proceed, which was broken down into three phases. The contract states that if the work is not completed within the time frame provided for each phase, Crowder will be penalized with liquidated damages for each day of delay beyond the time limit specified.[23]

In September 2022, representatives from CST and Crowder emailed back and forth about the terms of their subcontract. On September 23, 2022, Jeremy Harrison of Crowder sent Kempf and Hal Whitacre of CST Crowder's Subcontract Standard Terms & Conditions to review. This standard subcontract included a provision that "[t]he subcontractor shall obtain, furnish, and

---

[21] Ex. 1213.

[22] Ex. 24.

[23] The City's Project Book specifies that the liquidated damages for Phase A is $1,500 per day, for Phase B is $1,000 per day, and for Phase C is $500 per day. Ex. 1200 ¶ 11.

continuously carry, in the amounts specified . . . the following: 1) PERFORMANCE AND PAYMENT BONDS (if required by the Subcontract), issued by a corporate surety duly licensed."[24]  The standard subcontract further provided that the subcontractor must provide Crowder with certificates from the subcontractor's insurance carrier before the commencement of work.  Crowder intended to move forward with the project if CST signed the subcontract and issued a full bond.

On September 29, 2022, at 8:59 a.m., Whitacre, who was CST's Vice President of Sales, sent Crowder and CST representatives initial mark-ups to the subcontract as forwarded by Dean Roe, CST's Contract Manager, an attorney.  The bond provision was not marked up.  Several minutes later that same morning, at 9:10 a.m., Whitacre sent a lengthy email to Robards.  In this email, Whitacre stated, *inter alia*:

> Our bonding capacity is extremely limited.  We are a factory to [sic] so we don't bond that often anyway but a majority of our bonding capacity is currently tied up.  I would prefer not to bond, and if there is another route that you all have taken in the past I would be open to discussions on this.  I know that Dillon and our rep Jim had discussions with your team during the bid phase about this but I, again, don't want this to be a surprise as we work to get the contract approved and executed.[25]

CST's CEO, Jeff Mueller, confirmed in his testimony that CST did not have the capacity to fully bond the project; CST's bonding capacity was tied up on a different project, worth $15 million.

Robards was "shocked" when he read this email and found the news that CST could not fully bond the project "earth-shattering," because he believed that CST knew Crowder required a

---

[24] Ex. 1209, attach. ¶ V(A).

[25] *Id.* at 1.

full bond, particularly given CST's expectation of a substantial down payment. [26]   Robards
immediately shared this information with Hansen and other senior leaders at Crowder.

### Crowder's Efforts to Secure Bonding with CST

Around this time, the CEOs of CST and Crowder, Mueller and Hansen, had many
discussions about the bonding issue.  CST hoped that $5 million in bonding capacity would be
freed up soon from its other project so that it could put it toward the Byrd Park Project.  It also
offered to lower the down payment amount from the 30% they originally agreed to.  Hansen
conveyed to Mueller that Crowder understood CST had already agreed in writing to provide a
full bond, but was willing to listen to Mueller's other proposed options, such as providing a
partial bond or a letter of credit.

On October 20, 2022, Mueller sent Hansen an email attaching a "modified schedule of
values as discussed. . . .  I do note that CST clearly understands your desire for bonding and will
keep you apprised of bonding capacity as soon as it frees up."[27]   He indicated that CST could
offer a lower down payment to offset the risk that Hansen was concerned about.  Mueller also
indicated that he wanted to schedule with her "a time in the near term to review our audited
financials."  He hoped that if Crowder saw CST's financial information, it would be satisfied
with a lower bond, or preferably, no bond at all.

Soon after, Mueller scheduled a Microsoft Teams meeting for himself and his CFO to
review CST's financial information with Hansen and Crowder's CFO.  A representative of
Solace Capital, CST's private equity owner, was also present.  According to Mueller, the

---

[26] Doc. 150 (Tr., vol. 2 at 232:1–16).

[27] Ex. 1240.

information showed the CST was debt free "except to our shareholders at Solace."[28]  Hansen, a certified public accountant, learned during this meeting that CST had recently lost money and had little equity.  She and her CFO, also a certified public accountant, fully understood CST's ownership and debt structure, and were confident at the conclusion of the meeting that Crowder needed a full bond in order to work with CST.  In other words, reviewing CST's financial information made Crowder more, not less, resolved about the need for a bond.

### *Crowder Reinitiates Contact with Tank*

Although Crowder continued to discuss solutions to the bonding issue with CST, it reached out in the meantime to other potential subcontractors that could step in and replace CST if the issue could not be resolved.  Crowder considered the two other roof subcontractors that originally bid on the project.[29]  Crowder knew that on bid day, UIG, the other remaining prequalified bidder, could only commit to bonding 50% of the project.  This left Tank, which had submitted an "or equal" bid.  On October 18, 2022, Crowder reached out to Tank's broker to determine whether it was still interested, and if so, what its bonding capacity and payment structure would be.  Tank's outside broker, David Shoap of Shoap Process Equipment, quickly responded that Tank was qualified, interested, and "can definitely bond this project."[30]

Shoap previously sent Robards a copy of its surety letter from February 2022, when Tank originally bid on the project.  But Robards replied on November 11, 2022, that the surety letter did not make clear that the bonding company would provide a P&P bond for the full value of the project, and asked for Tank to clarify that it could indeed provide such a bond.  Robards

---

[28] Doc. 150 (Tr., vol. 2 at 109:18).

[29] There were originally three subcontractors prequalified by the City: CST, UIG, and Ultraflote. Ultraflote's business failed before the original bidding process, so it did not bid on the project.

[30] Ex. 1216 at 3.

continued: "If the answer to the bond question is favorable, I would like to schedule a virtual meeting" to discuss the project in further detail.[31]

By late December 2022, Tank put together a qualification package for the City's review. Robards contacted Kendall Smith, Regional Sales Manager at Tank, with several questions the City Engineer had about Tank's qualifications.  It sought details about Tank's and Ducotey's prior experience with triangulated, rectangular, flat, column-supported roofs.  It sought clarification of Ducotey's proposed role on the project, and it asked Tank to confirm whether there would be changes to the roof design.  LaForge responded to this email, explaining that he would be "stepping in to run point" while Smith was on vacation, and told Robards that Tank would review the questions and get back to him.[32]

Ducotey asked Whalen to help him compile a list of prior CST/Conservatek projects responsive to the City Engineer's questions.  Ducotey also reached out to former CST employee Nita Bailey because Whalen previously advised him that she kept information about prior CST work after she left the company.  Ducotey asked Bailey if she had a list of column-supported covers that Conservatek/CST worked on, and Bailey responded with a list two projects, one in Colorado Springs, Colorado, and one in Alpine, California.  She also asked Ducotey if Laurel, Maryland or Norfolk, Virginia sounded familiar.  Ducotey forwarded Bailey's email to Whalen on January 9, 2023.  Soon after, Whalen sent LaForge a response to the City's questions, and copied Bailey and Ducotey, as well as other Tank employees.  As for the City's question about prior projects, he stated that the experience is the same listed on the original bid, and included the projects listed in Bailey's earlier email to Ducotey.

---

[31] *Id.* at 1.

[32] Ex. 78.

On January 11, 2023, Smith sent Robards a revised proposal, along with answers to Robards' questions from the City.  The response explained, *inter alia*, that "TC has designed, manufactured and assisted with the installation of a 411' diameter, self-supported, clear span, aluminum geodesic dome utilizing all aluminum construction supports and triangulated panels as specific for this project."[33] The response also explained that the components of Tank's standard cover product utilizes the same components specified on the Byrd Park Project.  Next, the response highlighted Ducotey's prior experience, stating that he "has been involved with/over saw the design and manufacturing of multiple 'Like' projects with similar designs throughout his career designing aluminum structures."[34]  Tank then included the list of projects referenced in Whalen's January 9, 2023 email.  It explained that while it acknowledges the City's roof is unique, its engineers would utilize "the same engineering steps and decisions" that Tank engineers had used on hundreds of prior projects involving aluminum covers.[35]  Tank's response also confirmed that Ducotey would be the primary design engineer on the project, and attached an updated proposal to address the City's design change question.  Ducotey confirmed during his testimony that he did not complete the mechanical engineering designs for the CST projects he listed as part of his qualifications; he testified that he was involved and/or oversaw the designs, despite his name not being listed on internal CST documents.

### CST Contacts Hansen and the City's Team in Early 2023

On  January 27, 2023, Mueller emailed Hansen attempting to set up a time to meet and "ratify the final components of the existing contract awarded to CST by Crowder."[36]  Hansen

---

[33] Doc. 67 at 2.

[34] Ex. 67 at 3.

[35] *Id.*

[36] Ex. 1239.

replied on February 1, 2023, making it clear that the parties had no "existing contract" for the

Byrd Park Project:

> As Crowder has discussed with CST's representatives both before and after the bid, Crowder requires CST to be fully bonded.  A payment and performance bond is a material condition to our subcontract.  To date, Crowder has not received any requested changes to our subcontract other than a request to reduce or omit the bonding requirement.
>
> On November 7, Jeremy Harrison (Crowder's regional operation's manager) notified CST that the subcontract/letter of intent was put on hold because of discussions regarding CST "not having the capacity to fully bond the project."
>
> We are ready to review and to discuss changes to our subcontract; however, Crowder requires a fully bonded subcontract.  To make sure we have the same understanding, there is no "existing contract", nor has Crowder chosen CST to be its partner on this project.  We are willing to discuss options with you; however, we are not in a position to enter into a subcontract with CST that is not bonded, nor will Crowder enter into a subcontract that's not in accordance with its terms and conditions or our subcontract.[37]

Mueller understood at this time that the project was "on hold," but was unsure what that

meant, although he did not reach back out to Crowder to find out.  Instead, CST submitted

Freedom of Information Act ("FOIA") requests to the City to determine the status of the project,

and whether another subcontractor had replaced it.  Based on responses it received to this

request, CST instructed its attorney to send a cease-and-desist letter to Tank, directing it to stop

using CST's projects in its bids for work based on Ducotey's and Whalen's prior experience.

Once Tank received this letter, it removed the photographs it had used in bids with the CST and

Conservatek projects.

---

[37] *Id.*

Also in March 2023, Muller sought a meeting with the City, its engineers from Greely and Hansen, and AECOM (the project manager) to discuss the status of the project.  Brian Hill from AECOM coordinated with Mueller to set up a meeting time, and suggested that a representative from Crowder attend.  They settled on a March 6, 2023 in-person meeting. Mueller indicated that he was "not bringing counsel and [was] interested in an open dialogue, further building relationships, trust and mutual understanding."[38]  He stated that although CST was "interested in completing this project with Crowder[,] . . . . [o]ur sincere preference is to meet on Monday initially without Crowder and respectfully request that we have time to meet collectively with the City, AECOM and [Greely and Hansen] prior to Crowder joining."[39]  He also indicated that some of the issues he wished to discuss "based on the FOIA request are delicate."[40]

Nonetheless, Robards learned of the March 6 meeting and attended on behalf of Crowder. At this meeting, Mueller communicated his opinion that CST was the only company that was qualified to perform the subcontract on the Byrd Park Project, and suggested that if CST was not chosen, the project would fail.

### Crowder and Tank's Subcontract

By April 2023, Crowder and Tank reached an agreement to execute a subcontract for the roof on the project in the amount of $18,447,808, which included a full P&P bond.  Crowder told Tank it would not execute a subcontract "until the bond was in our hands."[41]  The bonds were

---

[38] Ex. 908.

[39] *Id.*

[40] *Id.*

[41] Ex. 1261.

issued on April 14, 2023.[42]  By April 18, the subcontract between Crowder and Tank had been submitted to the City for approval, along with Tank's design team submittal.  Crowder was waiting on a change order from the City showing Tank had replaced CST.

The City's engineers approved Crowder's request to use Tank as the roof subcontractor on April 25, 2023.  The change was approved because "[b]ased on the information included in [the] submittal, the proposed tank connection design team appears to have adequate qualifications for this project, since the key members have similar experience with triangulated, rectangular, flat, column supported roof systems from previous work with Conservatek and then CST."[43]  Along with the resumes of several other design team members, Tank's submittal included the summaries of experience for Whalen and Ducotey that were included in the original bid, including photographs of CST and Conservatek projects they claimed to have worked on, without attribution in the captions of the photographs.  It made clear that Ducotey would be Tank's "lead structural engineer for this project."[44]

On May 12, 2023, Tank sent Crowder its submittal package for the roof design.  Ducotey testified that this document is responsive to the City's roof specification and that he did not use any CST work product to prepare the document.  In fact, Ducotey never saw CST's design proposal for the project and had built new design software since leaving CST.

Currently, the Byrd Park Project roof subcontract is in the fabrication stage.  Tank has already purchased the materials to complete the project.  According to Tank and Crowders' representatives, the project is on track and both sides are confident in the project and its progress.

## III.    Discussion

---

[42] Exs. 1258, 1259.

[43] Ex. 21 at 1.

[44] *Id.* at 22.

In its motion for preliminary injunction, CST seeks to enjoin:

1.     Crowder and Tank from installing the tank roof for the Byrd Park Project;

2.     Crowder, Tank, and LaForge from using or disclosing any document, information, or trade secrets taken from CST in violation of law or agreement, including CST's method of distributing lateral loads for column supported covers, designing the column supported covers, and information and processes to calculate lateral loads for column supported covers;

3.     Tank from further representing in submissions for contract bids and requests for proposals that it or its employees were responsible for CST or CST predecessors' projects using CST Secrets, including: (1) the 1996 Syracuse, New York Case project; (2) the 2002 Carpinteria, California project; (3) the 2004 Gainesville, Florida project; and (4) the 2008 Rancho Bernardo, California project (the "CST Projects").

**A.     Likelihood of Success on the Merits**

CST contends it is likely to succeed on the merits of its tortious interference with business expectancy and unfair competition claims.[45]  These claims are brought in diversity, so the Court looks to the forum state's choice-of-law rules.[46]  CST maintains, and Defendants do

---

[45] In its opening brief, CST argued it was likely to succeed on the merits of its "tortious interference claims."  However, in its reply, CST did not address Defendants' arguments on the tortious interference with existing contract claim in Count 1; instead, confining its arguments to Count 3.  The Court therefore finds that CST waived any argument that Count 1 forms the basis of its request for a preliminary injunction and confines its analysis to the tortious interference with business expectancy and unfair competition claims.  Even if CST had preserved its arguments on Count 1 in the reply, the Court finds that the preliminary injunction record is devoid of evidence that Tank and Crowder knew that Ducotey and Whalen engaged in certain employment agreements with CST when they worked there, and intentionally interfered with those contracts by causing Whalen and Ducotey to breach them.

[46] *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257 (10th Cir. 2006) (citation omitted).

not dispute, that under Kansas's choice-of law-rules, Missouri tort law applies because that is where CST felt the financial harm since Missouri is CST's principal place of business.[47]  The Court therefore applies Missouri law to determine CST's likelihood of success on the merits.

### 1.    Count 3:  Tortious Interference with Business Expectancy

CST alleges in Count 3 that it had a reasonable and valid business expectancy with Crowder on the Byrd Park Project, and that Tank and LaForge intentionally interfered by misrepresenting Ducotey's and Whalen's experience, by engaging in unfair competition, and by causing Ducotey and Whalen to breach their CST employment agreements.

Under Missouri law, the elements of a claim for tortious interference with contract or business expectancy are:  "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct."[48]  This claim is alleged against Tank and LaForge only.

Under the first element of its tortious interference claim, CST must have "a reasonable expectancy of financial benefit."[49]  Crowder argues that CST did not have a reasonable business expectancy because the LOI made clear Crowder intended to award CST the contract pending negotiation of material terms, and a material term of the contract was that CST post a bond, which it could not do.  Crowder maintains that it did not decide to contract with Tank until it established that CST could not bond the project, and that Tank could post a 100% bond.

---

[47] *See Snyder Ins. Servs., Inc. v. Kulin-Sohn Ins. Agency, Inc.*, No. 16-2535-DDC-GLR, 2018 WL 2722500, at *2 n.2 (D. Kan. June 6, 2018).

[48] *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 19 (Mo. 2012) (en banc).

[49] *Id.* (quoting *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 251 (Mo. 2006) (en banc)).

CST replies that it had a reasonable expectancy of a future business relationship with Crowder based on the LOI and the parties' subsequent conversations.  CST further argues that Crowder used the bonding requirement as a pretext to work with Tank for a lower contract price, pointing out that the LOI did not mention a bonding requirement, and that Crowder reached out to Tank at the same time it was still engaged in negotiations with CST.  According to CST, Crowder saw an opportunity to save money by working with Tank at a "steep discount" if they dropped CST from the project.

The evidence does not demonstrate that CST is likely to succeed in proving it had a reasonable expectancy of a future business relationship with Crowder, or that Crowder opted to work with Tank due to cost savings.  The parties never entered into a contract on the Byrd Park Project, and Mueller's testimony and email to the contrary are legal conclusions to which the Court gives no weight.  The documents—the March 17 amended bid and the LOI—do not support Muller's contention that the parties formed a binding contract.

The LOI clearly states that there were material terms and conditions left to be agreed upon.  And the parties' email exchanges support exactly that—they continued to negotiate the details of the subcontract before and after the LOI was signed.  Prior to the LOI, Crowder relied on Chastain's representations that CST could fully bond the project, a term and condition that was material to Crowder.  It was not until it became apparent that CST could not and would not bond that Crowder re-initiated contact with Tank.  And, critically, Crowder consistently made it clear to Tank that it would not move forward on a subcontract without a full bond.  Crowder would not sign the subcontract with Tank until those documents were in hand.

Mueller testified that the bond was not an original condition for Crowder and, if it was, CST would not have bid on the project because he required all requests for bond to be approved

by him.  He also testified that the bond issue became more important as time went on, which he

did not understand because CST rarely provided a bond for its work given its status as a leader in

the industry.  Mueller's testimony fails to rebut the other evidence in the record that makes plain

that a full P&P bond was a material term of any subcontract Crowder entered into on this project,

and that CST's failure to adhere to Chastain's representation on bid day that CST could post such

a bond is the reason Crowder looked to Tank as a subcontractor instead.

The emails make clear that with or without Mueller's approval, CST's broker assured

Crowder before bid day that CST could fully bond the project, even going so far as to name the

bonding company it would use.  Despite testimony that Chastain represented CST in bidding on

the Byrd Park Project, and that representation by an outside broker like Chastain was standard in

the industry, Mueller apparently had no idea that Chastain was negotiating on CST's behalf until

almost a year later.[50]  In fact, Mueller testified that the first time he remembered talking to

Chastain was in late 2022 or early 2023.  But the evidence shows that Hansen and others at

Crowder reasonably relied on Chastain's representations, and the Court gives weight to Hansen's

undisputed testimony that Crowder would not have bid on the project at all if it had not found a

subcontractor that would fully bond the project.  In sum, Hansen's and Robards' testimony,

along with the parties' emails, belie Mueller's understanding of the negotiation process.

Hansen's February 1, 2023 email to Mueller further supports Defendants' position that it

was the bond, and not any cost savings to Crowder by working with Tank, that caused Crowder

---

[50] Hansen and Robards both testified that this practice was standard in the industry.  Hansen also testified
that Crowder had never been required to confirm representations made by a third-party broker directly with the
bidder before.  And Robards testified that in terms of the initial bid, it is standard that the general contractor sends
questions and receive answers to a subcontractor's bid, typically by email without executing an addendum.
Although Mueller had extensive experience leading engineering groups for other companies outside of the
aluminum cover industry prior to his tenure at CST, he had no prior experience in this specific industry prior to
joining CST two years before these negotiations occurred. The Court therefore gives greater weight to Hansen's and
Robards' testimony on this point.

to replace CST as the roof subcontractor.  Hansen corrected Mueller's suggestion that the parties had entered into a contractual relationship.  They had not.  She explained that the bond requirement was firm and nonnegotiable, and that since CST could not meet that material term, their LOI was on hold.

There is no evidence in the record that the difference in contract price between CST and Tank was a motivating factor for Crowder.  Hansen testified that Crowder had every intention of contracting with CST if it had signed Crowder's standard subcontract, which included the bond.  And Robards testified that due to exclusions and risks that shifted to Crowder, it has not realized any cost savings associated with Tank's subcontract.

The evidence discussed above also demonstrates that CST is not likely to succeed in proving that any damages it sustained was caused by Tank's and LaForge's interference into their business relationship with Crowder.  Moreover, the evidence is clear that Crowder selected CST and not Tank on bid day, despite the fact that CST's price was higher than Tank's and others because Chastain represented that the price would include a full bond.  Crowder continued to try to negotiate and execute a subcontract with CST well into the fall of 2022.  Crowder did not reach out to Tank to discuss replacement until receiving Whitacre's email on October 16, 2022, advising that CST did not have the bonding capacity Crowder required.  Thus, it was not Tank's conduct that caused CST to lose its subcontract; it was CST's inability to meet Crowder's material term of bonding.

In sum, the evidence does not support that CST had a reasonable expectation of a future business relationship with Crowder and the City when it declined to post a full P&P bond—a material term for Crowder of which Mueller was well aware.  Nor does the evidence support that CST's damages were caused by the actions of Tank and/or LaForge.  Accordingly, CST has not

shown that it is likely to succeed on the merits of its tortious interference with business expectancy claim.

### 2. Count 6: Unfair Competition

Under Missouri law, unfair competition "consists, essentially, in passing off or attempting to pass off, on the public, the goods or business of one person as and for the goods or business of another, or in the conduct of a trade or business in such a manner that there is either an express or an implied representation to that effect."[51]  There may be liability where "in connection with the marketing of goods or services, the actor makes a representation likely to deceive or mislead prospective purchasers by causing the mistaken belief that the actor's business is the business of the other, or that the actor is the agent, affiliate, or associate of the other, or that the goods or services that the actor markets are produced, sponsored, or approved by the other."[52]  CST must also show "[e]ither actual or probable deception."[53]  CST alleges unfair competition against all Defendants; therefore, the Court considers the evidence as to each Defendant separately.

### a. Tank

CST claims that Tank passed off CST projects as its own by including pictures of those projects without attribution in the qualification package it submitted when Crowder sought to have Tank approved by the City to replace CST on the project.  CST maintains that these representations were key to the City's decision to approve Tank as a replacement subcontractor

---

[51] *Nat'l Motor Club of Mo., Inc. v. Noe*, 475 S.W.2d 16, 19 (Mo. 1972).

[52] *Am. Equity Mortg., Inc. v. Vinson*, 371 S.W.3d 62, 64 (Mo. Ct. App. 2012) (quoting Restatement (Third) of Unfair Competition § 2).

[53] *Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, No. 22-CV-01308, 2023 WL 4026185, at *11 (E.D. Mo. June 15, 2023) (alteration in original) (quoting *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 277 S.W.3d 686, 693 (Mo. Ct. App. 2008)).

because Tank had never installed a triangulated, rectangular, flat, column-supported roof.  CST claims that these misrepresentations have harmed and will continue to harm its reputation or goodwill by creating confusion in the marketplace about CST's experience, trade secrets, and projects, and that any adverse results on the project are likely to be attributed to CST.  Tank responds that CST cannot show that it made any representation in the bid that was likely to mislead because the summaries of experience clearly attributed Ducotey's and Whalen's experience to their time at CST/Conservatek.  Tank further argues that CST cannot show it suffered commercial detriment because of the misrepresentation.

The Court finds that CST is not likely to succeed on the merits of the unfair competition claim against Tank because the evidence does not demonstrate that Tank made representations that were likely to deceive or mislead Crowder or the City.  It is unlikely that CST can demonstrate that the qualification package and bids Tank submitted caused the mistaken belief that Ducotey or Tank represented CST; that Crowder was contracting with the equivalent or subsidiary of CST; or that CST produced, sponsored, or approved Tank's design.  The Court has reviewed the summaries of experience completed in March 2022 and in April 2023, as well as Tank's response to the City's questions about its experience in January 2023.  Despite the lack of attribution in the photographs appended to Whalen's and Ducotey's summaries of experience, the summaries themselves make clear that their experience was based on their time at CST and Conservatek.  The response to the City's questions in January 2023 make this clear as well. While there is certainly evidence that Ducotey and Whalen leveraged their experience at CST to win the bid on behalf of Tank, and that neither of them completed the technical, mechanical designs for those projects, such evidence falls short of showing that Tank tried to "pass off" CST's work as its own.

CST argued at the hearing that Whalen accessed and used CST's confidential and proprietary information, pointing to internal emails and instant messages suggesting he had access to some of CST's documents.  This evidence too falls short of demonstrating the passing off element of CST's unfair competition claim.  The emails do not demonstrate that Tank used CST's confidential information in designing the Byrd Park Project.  Three of these emails do not mention the Byrd Park project,[54] and the others discuss information needed to put the list of past projects together for the Byrd Park Project bid.[55]  As already discussed, the bid makes clear that Ducotey and Whalen's past experience was with CST and Conservatek.  Moreover, Tank's response to the City's inquiries in early 2023 makes clear that, in addition to Ducotey's prior experience at CST, its own engineers had ample experience with projects using similar components.  Tank did not solely rely on Ducotey's past experience at CST.  And Tank ceased using the photographs of past CST projects in its bids after it received CST's cease-and-desist letter.

Moreover, CST is unlikely to succeed in showing that Tank's representations about Ducotey's and Whalen's experience hurt CST's reputation, or that the Byrd Park Project is likely to fail, which would then be attributed to CST.  There was no evidence presented at the hearing about reputational harm.  Mueller and Daniel Marucci, Senior Engineer at CST, testified that they were aware of Tank using the CST project lists and photographs for bids other than Byrd Park, but CST presented no evidence of this.[56]  Tank presented evidence that it stopped using the

---

[54] Exs. 113, 115, 119.

[55] Exs. 51, 57, 78, 112.

[56] Mueller testified that he had "seen documents circulated within CST, that I do not have at my disposal right now, which lead me to personally believe that there are many examples in the industry of Tank Connection trading on CST's brand name, goodwill, reputation.  And simply telling the industry, as they have here, hey, we have an engineer from CST, we're CST."  Doc. 150 (Tr., vol. 2 at 25:8–13).  CST offered no exhibits to support this testimony.

CST project photographs once it received CST's cease-and-desist letter in March 2023.  There is no evidence of CST losing other contracts, or otherwise suffering reputational harm in the industry.

There was likewise no non-conclusory evidence that Tank has poorly performed on the subcontract, nor evidence that such performance would be attributed to CST.  Mueller and Marucci both testified that they believed Tank's design was similar to CST's, but they did not have access to Tank's final design documents, so the Court gives little weight to this testimony.  CST spent ample time at the hearing poking holes in Ducotey's knowledge of the lateral load calculations for the project; Marucci testified that there could be issues if these were incorrect, and that Ducotey's response to the City's early inquiries about these calculations shows a lack of experience.  But Ducotey responded to the City's inquiry that Tank required more information on the issue and admitted that the price quoted for the design at that point—November 2022— did not account for lateral loads.  Tank indicated that it needed information from the City Engineer, and that if the cost would increase based on those calculations, Tank would issue a change order.  Ducotey testified that these lateral load questions were based on the initial design renderings that would determine price, not the final design.  And Robards testified that he had no concerns about the way Tank responded to the question.  Importantly, witnesses still involved in the project, which is now well underway, testified that the project is going well and indicated high confidence that it would be a success.

For all of these reasons, the Court finds that CST is not likely to succeed on the merits of its unfair competition claim against Tank.

> **b.      La Forge**

There was no evidence presented at the hearing to support a finding that CST is likely to succeed on the merits of its unfair competition claim against LaForge.  LaForge, who became CST's Liquid Market Manager about three months after Tank's original bid was submitted to Crowder, testified he had no involvement in the Byrd Park project, nor did he help prepare the summaries of experience attached to Tank's bid that form the basis of CST's unfair competition claim.  CST points to emails from LaForge in 2023, seeking to make the Byrd Park proposal generic so that it could be used to bid on other projects.  But LaForge testified that once Tank received the cease-and-desist letter from CST in the spring of 2023, Tank removed all photos of CST and Conservatek projects from the prequalification packages it used with Whalen's and Ducotey's summaries of experience.  His participation in the emails between Crowder and Tank to respond to the City's questions in January 2023 was limited to his role as an intermediary, filling in for the sales manager on vacation.  CST is not likely to succeed on the merits of its unfair competition claim against LaForge.

### c.      Crowder

CST argues that Crowder is responsible for Tank's misrepresentations because as the general contractor, it is responsible for Tank's untrue representations in the bid package.  It relies on a provision in the City's Project Book that any untruthful statement by a subcontractor is assumed by the general contractor.[57]  Also, CST argues that Crowder approved and adopted Tank's misrepresentations when it asked the City to approve Tank as the replacement subcontractor, despite its lack of prequalification.  Crowder responds that none of the factual allegations in the Amended Complaint pertain to it, and that CST would have to show that

---

[57] *See* Ex. 34, Part 2 ¶ 3.12.

Crowder knew Tank's representations were false at the time they were made, but they failed to plead or prove that at the hearing.

CST's unfair competition claim against Crowder relies on a joint liability theory with Tank.  First, as a matter of law, CST wholly fails to explain how Crowder can be liable to CST based on the City Project Book's language that the general contractor is responsible for untruthful statements by a subcontractor, given that CST is not in a contractual relationship with either the City or Crowder.  Moreover, given that CST's theory of liability against Crowder is premised on Tank's liability, CST is unlikely to succeed on the merits of its claim against Crowder for the same reasons it is unlikely to succeed on its claim against Tank.  The record is wholly devoid of evidence of Crowder's actual or probable deception.  Crowder was consistently clear with CST that it required a full bond as a material term of any subcontract on the project. Accordingly, CST is not likely to succeed on the merits of its unfair competition claim against Crowder.

### B.      Irreparable Harm

CST argues that it will suffer irreparable harm without the requested injunctive relief.  To constitute irreparable harm, the injury "must be both certain and great."[58]  It "is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'"[59]  "[L]oss of customers, loss of goodwill, and further erosion of [the plaintiff's] competitive position in the . . . industry . . . . are the types of factors that district courts should consider when deciding whether a plaintiff has

---

[58] *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[59] *Id.* (quoting *Am. Hosp. Ass'n v. Harris*, 625 F. 2d 1328, 1331 (1980)).

shown a sufficient probability of irreparable harm."[60]  However, it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm [because] such losses are compensable by monetary damages."[61]

CST first maintains that its loss of goodwill and reputational harm cannot be compensated by damages alone.  It claims that Tank's conduct has caused confusion about the source of CST's work by falsely claiming credit for it.  Specifically, CST maintains that "the imprimatur of CST is and will be emblazoned on Tank Connection's performance on this Project," and that the project's "ultimate failure will be attributed to and irreparably damage CST's goodwill and reputation."[62]  As to any loss of CST's competitive edge based on interference with the subcontract, Defendants argue that the proper remedy is a measurable amount of damages—the amount of money lost on the subcontract.

The Court finds that the evidence does not support CST's claim of reputational harm.  As already discussed, there is no evidence that Tank used CST project lists and photographs after receiving the cease-and-desist letter, and there is no evidence that the City was misled into believing CST was effectively working with Crowder on the project.  There is no evidence of CST losing other contracts, or otherwise suffering reputational harm.  There is also no evidence in the record that the project is destined to fail without CST's involvement other than Mueller's and Marucci's speculative testimony.  Instead, the evidence shows that the project is going smoothly and Crowder is satisfied and confident in Tank's performance.  Moreover, the Court

---

[60] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1271 (10th Cir. 2018) (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004)).

[61] *Ditucci v. Bowser*, 985 F.3d 804, 811 (10th Cir. 2021) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005)) (collecting cases).

[62] Doc. 65 at 11.

agrees that the proper measure of damages to CST would be the contract price, not injunctive relief stopping the project in its tracks.

Second, CST claims that Defendants' misconduct is continuous and ongoing, requiring injunctive relief.  It states that there is at least one other bid in which Tank used similar representations to obtain approval for a public project.  Again, there is no non-speculative evidence to support the claim that Tank is actively misrepresenting Ducotey and Whalen's experience on other bids, particularly given the testimony that Tank stopped using the photographs of CST projects in its bids after receiving the cease-and-desist letter.

Third, CST argues that it stands to lose a competitive edge in the marketplace if Tank is allowed to continue to use its trade secrets and damage its reputation.  Tank responds that any injury to CST is not imminent, pointing out that CST failed to move for preliminary injunctive relief until almost one year after Crowder engaged Tank for the subcontract.  CST filed the original Complaint on August 3, 2023, but failed to seek a preliminary injunction until January 26, 2024.  CST replies that it is not required to immediately seek injunctive relief in order to show that damage to goodwill and reputation will cause it irreparable harm.

As already discussed, the evidence presented at the hearing falls short of showing that Tank is using CST's trade secrets.  Indeed, CST does not contend on this motion that it is likely to succeed on its trade secrets claim.  The internal emails upon which CST relies do not establish that Tank is using CST's non-public information in its designs.  Ducotey was emphatic that the Byrd Park design was not based on any previous design by CST, and that he used new software to complete it.  Marucci and Mueller's speculative testimony concerned similarities in design based on the documents submitted with Tank's initial bid; they have not reviewed Tank's final design documents.

The Court also agrees with Defendants that there is no evidence of an imminent injury. The evidence indicates that Mueller suspected foul play was involved in the subcontract falling apart by March 2023, when he called the meeting with the City and its engineers.  He had received information on at least one of the FOIA requests at that point, and knew that the negotiations with Crowder had stalled out for months due to CST's inability to bond the project. CST filed this lawsuit in August 2023, yet waited until the project was well underway in January 2024 before seeking preliminary injunctive relief.

The Tenth Circuit has explained that while "there is no categorical rule that delay bars the issuance of an injunction," such delay must be "reasonable, [and] not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party."[63]  Here, there is no explanation for the delay given the allegations in the original Complaint.  There was no evidence of factual developments after August 2023 that created the threat of irreparable harm.  Instead, CST waited for months until the project was well underway to move for injunctive relief.  Tank is in the fabrication stage of the project.  Burke testified that Tank's design process is complete and it has already manufactured the cover for the first water tank.  Crowder is well into its 1,580-day clock to complete the project before liquidated damages kick in.  The prejudice to Defendants due to CST's delay therefore is substantial.

Finally, CST maintains that there is a "significant risk to the public absent immediate injunctive relief" because the City and neighboring counties rely on the project for drinking water.[64]  Defendants respond that the public safety argument is unfounded because there are several safeguards in place: (1) Berkely Insurance bonded the full $18.4 million subcontract

---

[63] *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210, 1211–12 (10th Cir. 2009)).

[64] Doc. 65 at 12.

value; and (2) the City and its engineers will conduct oversight of the project, including ensuring safety standards are met. CST replies that there is no evidence that the surety company or the engineers sufficiently inspect Tank's design and installation. The Court disagrees. There is no non-speculative evidence in the record that suggests the project is unsafe due to the lack of CST involvement. In contrast, the parties to the contract both testified that the project is going smoothly and there have been no concerns. Moreover, the Court agrees with Crowder that the project's bonding, as well as the oversight process by the City and its project manager, hedge against any risk that Tank's design or installation is faulty.

In sum, CST has not shown that irreparable injury is likely in the absence of an injunction.

### C.     Balance of Harms

Defendants argue that stopping work on the Byrd Park Project's roof will cause them significant damage that outweighs any speculative injury to CST's reputation if the injunctive does not issue. The Court agrees. The roof subcontract for Crowder represents a significant portion of the total project value, and Crowder has entered into six separate subcontracts and over thirty purchase orders. Delays to the project schedule will subject Crowder to additional costs as well as liquidated damages if it breaches its contract with the City to provide deliverables in accord with the Project's schedule. Additionally, Tank has already manufactured a significant portion of the materials for the contract, and expended significant costs to design the roof. The costs of issuing the requested injunction to both Defendants is tangible and far outweighs the speculative harm to CST if the Court does not grant the motion.

### D.     Public Interest

CST bases its public interest argument on the risk of allowing an unqualified subcontractor to install the roof on the Byrd Park Project.  Defendants respond that there is no evidence of a risk to public safety, and that the public interest is not served by restraining competition and interfering with the public bidding process that caused Tank to be chosen as the subcontractor on the project.  For the reasons described above, the Court finds no non-speculative evidence in the record to support the claim that Tank's performance of this subcontract is a threat to public safety.  Moreover, the Court finds that the public's interest in enforcing the existing, executed contract between Tank and Crowder outweighs any contrary public interest.[65]

In sum, the Court finds that CST fails to make the requisite showing on any of the four factors the Court must apply to determine that preliminary injunctive relief is warranted.  Accordingly, CST's motion for preliminary injunction must be denied.

**IT IS THEREFORE ORDERED BY THE COURT** that CST's Motion for Preliminary Injunction (Doc. 64) is **denied**.

**IT IS SO ORDERED.**

Dated: April 9, 2024

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[65] *See Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1149–50 (D. Kan. 2007).