IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CST INDUSTRIES, INC.,

      Plaintiff,

      v.

TANK CONNECTION, L.L.C. , et al.,

      Defendants.

Case No. 23-2339-JAR-RES

## MEMORANDUM AND ORDER

This case involves two business rivals seeking to become the roof subcontractor for a large municipal project to construct a drinking water reservoir for the City of Richmond, Virginia.  Plaintiff CST Industries, Inc. ("CST") brings claims against its competitor, Tank Connection, L.L.C. ("Tank"); as well as Tank's Liquid Market Manager, Jordan LaForge; and the general contractor for the project, Crowder Construction, Inc. ("Crowder").  CST's Amended Complaint alleges the following claims for relief: Count I—tortious interference with contract against Tank and Crowder; Count II—violations of the Defend Trade Secrets Act ("DTSA") against Tank and Crowder; Count III—tortious interference with business expectancy against Tank and LaForge; Count IV—civil conspiracy against Tank and Crowder; Count V—aiding and abetting against Tank and Crowder; Count VI—unfair competition against all Defendants; and Count VII—permanent injunction against all Defendants.[1]

Before the Court are Tank's and LaForge's Motions to Dismiss (Docs. 57 and 59).  LaForge moves to dismiss Count III under Fed. R. Civ. P. 12(b)(6).  Tank moves to dismiss Counts I, II, III, and V in their entirety, and to partially dismiss Count IV under Rule 12(b)(6).

---

[1] Doc. 38.

These motions are fully briefed and the Court is prepared to rule.  For the reasons discussed below, the Court grants in part and denies in part Tank's motion to dismiss.  The motion is granted as to Counts II and V; it is otherwise denied.  LaForge's motion to dismiss Count III is denied.

## I.      Standard

Under Rule 12(b)(6), "only a complaint that states a plausible claim for relief survives a motion to dismiss."[2]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[3]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[4]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all of the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[5]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[6]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[7]  "A claim has facial plausibility when the plaintiff pleads factual

---

[2] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[3] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[4] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[5] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[6] *Id.* at 678−79.

[7] *Id.* at 679.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]

II.   **Facts**

The following facts from the Amended Complaint are accepted as true and viewed in the light most favorable to CST.

CST is the largest dome and storage tank manufacturer in the world.  In early 2022, the City of Richmond, Virginia (the "City") opened bidding on the construction phase of the Byrd Park Reservoir Rehabilitation Project (the "Byrd Park Project" or "Project"), which included replacing the roof system on the 55-million-gallon water reservoir that supplies water to the City and parts of two surrounding counties.  At the time the City opened up bidding on construction, CST was one of three potential roof subcontractors preapproved by the City, and the only manufacturer selected as the subcontractor by all of the general contractors who submitted bids.  Tank, a competitor of CST's, was not preapproved by the City, and had not been selected by any of the general contractors who submitted bids.

Nevertheless, Tank presented a qualification package to the general contractors submitting bids to the City, including Crowder, who was ultimately chosen as the general contractor by the City.  The qualification package contained Tank's purported experience and qualifications to serve as the subcontractor for the Project.  CST eventually learned that Tank misrepresented its experience and qualifications in this qualification package by (1) passing off projects that had been performed by CST as its own, based on former CST employees Steve Ducotey and Casey Whalen's involvement in those projects, and (2) grossly inflating the experience of members of its proposed team who were former CST employees.  The

---

[8] *Id.* at 678.

qualification package, and subsequent materials provided by Tank to the City, included pictures of projects completed by CST and misrepresentations about Tank employees' involvement with those projects when they previously worked for CST or its predecessors.

Tank knew its qualification package contained significant misrepresentations because Ducotey and Whalen (both former CST employees) participated in preparing, drafting, editing, and submitting Tank's false materials.  Ducotey and Whalen, who each had employment agreements with CST during their tenures there, had access to CST's confidential information during their employment with CST.  LaForge, Tank's Liquid Market Manager, also participated in preparing, drafting, editing, and submitting Tank's false materials.  The process was "collaborative."[9]

The City required triangulated, rectangular, flat column supported roof structures for the Project, something CST had experience with.  Tank, on the other hand, had never installed this type of roof before.  Tank relied on Ducotey and Whalen's previous experience with CST in submitting its qualification package.  Despite initially choosing CST as the roof subcontractor, Crowder ultimately entered into a subcontract with Tank to manufacture and install the roof for the Byrd Park Project, claiming that it could not execute a subcontract with CST due to CST's inability to supply a bond on the Project.

## III.    Discussion

CST's claims are brought in diversity, so the Court looks to the forum state's choice-of-law rules.[10]  Under Kansas choice-of law-rules, Missouri tort law applies because that is the state

---

[9] Doc. 38 ¶ 74.

[10] *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1260 (10th Cir. 2006) (citation omitted).

where CST felt the financial harm it alleges; Missouri is CST's principal place of business.[11]

The parties do not dispute that Missouri law applies.  Thus, the Court applies Missouri law to

determine the sufficiency of each claim that Tank and LaForge move to dismiss.

### A.    Tortious Interference Claims

Under Missouri law, the elements of a claim for tortious interference with contract or

business expectancy are: "(1) a contract or a valid business expectancy; (2) defendant's

knowledge of the contract or relationship; (3) intentional interference by the defendant inducing

or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages

resulting from defendant's conduct."[12]  Although the elements are the same, "Missouri law

continues to treat [the] two forms of tortious interference as distinct and separate torts."[13]  One

tort applies "to the defendant's intrusion on an existing contract," while the other applies "to the

defendant's interference with a reasonable expectancy of future financial benefit."[14]  Moreover,

under the first element, "[a]n existing contract is entitled to greater protection than a mere

expectancy of entering a contract."[15]

### 1.    Tortious Interference with Existing Contract (Count I)

Count I alleges that Tank and Crowder knew that Ducotey and Whalen engaged in certain

employment agreements with CST, and that Tank and Crowder intentionally interfered with

---

[11] *See Snyder Ins. Servs., Inc. v. Kulin-Sohn Ins. Agency, Inc.*, No. 16-2535-DDC-GLR, 2018 WL 2722500, at *2 n.2 (D. Kan. June 6, 2018).

[12] *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 19 (Mo. 2012) (en banc) (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 614 (Mo. 2006) (en banc)).

[13] *Creative Compounds, LLC v. ThermoLife Int'l, LLC*, 669 S.W.3d 330, 340 (Mo. Ct. App. 2023) (alteration in original) (quoting *Rail Switching Servs., Inc. v. Marquis-Mo. Terminal, LLC*, 533 S.W.3d 245, 258 (Mo. Ct. App. 2017)).

[14] *Id.* (quoting *Rail Switching Servs., Inc.*, 533 S.W.3d at 258–59).

[15] *Howard v. Youngman*, 81 S.W.3d 101, 115 (Mo. Ct. App. 2002) (citing *Juengel Constr. Co. v. Mt. Etna, Inc.*, 622 S.W.2d 510, 516 (Mo. Ct. App. 1981)).

CST's confidentiality obligations in those contracts by causing Whalen and Ducotey to share with Tank confidential information they learned during their employment at CST.  The contracts specified in the Amended Complaint are: (1) the Ducotey Executive Employment Agreement; (2) the 2008 Ducotey Confidentiality Agreement; (3) the 2011 Ducotey Confidentiality Agreement; and (4) the Whalen Separation Agreement.

Tank moves to dismiss on the basis that CST fails to plead facts supporting the third element of the claim, that Tank intentionally interfered with these contracts by causing or inducing Ducotey and Whalen to breach their confidentiality obligations.  "A defendant induces a breach of contract if he actively and affirmatively takes steps to induce the breach and the contract would have been performed absent interference from the defendant."[16]

The Amended Complaint alleges that Ducotey and Whalen breached the confidentiality obligations under their employment agreements "by furnishing Tank Connection and Crowder with confidential information necessary for Tank Connection to construct triangulated, rectangular, flat column supported roof structures, necessary for the Project."[17]  The Amended Complaint does not specify what confidential information Ducotey and Whalen used.  Instead, CST alleges that because Tank had never constructed or installed a new column-supported triangulated aluminum roof, Ducotey and Whalen must have supplied Crowder and Tank with confidential information in order to secure the bid and design the roof.  CST also alleges that after the City requested additional information from Tank, Tank responded by providing confidential information about four CST projects that neither Ducotey nor Whalen had participated in.  CST alleges that Tank knew that Ducotey and Whalen were breaching their

---

[16] *Id.* at 114 (citing *Tri–Cont'l Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 216–17 (Mo. Ct. App. 1976)).

[17] Doc. 38 ¶¶ 132, 177; *see also* ¶¶ 149, 165, 180.

employment agreements by including protected information in the qualification package and follow-up response to the City's request for information.

At this stage of litigation, the Court must assume that CST's well-pled facts are true. CST alleges that Tank knew or should have known about Ducotey and Whalen's obligations under their employment agreements with CST, and that it was motivated to use their knowledge of confidential information to secure the subcontract with Crowder and the City.  The Amended Complaint further alleges that Tank, Ducotey, and Whalen collaboratively worked on the qualification package and the response to the City's request for more information.  Moreover, "[w]hether a defendant has played a material and substantial part in causing the plaintiff's loss of the benefits of the contract is normally a question of fact for the jury."[18]  Thus, the Court finds that CST has met its burden of demonstrating a plausible claim for tortious interference with at least one of the existing contracts identified in Count I.

### 2.      Tortious Interference with Business Expectancy (Count III)

CST alleges in Count III that it had a reasonable and valid business expectancy with Crowder on the Byrd Park Project, and that Tank and LaForge intentionally interfered by misrepresenting Ducotey's and Whalen's experience, by engaging in unfair competition, and by causing Ducotey and Whalen to breach their CST employment agreements.  Both Tank and LaForge move to dismiss this claim on the basis that any alleged interference with CST's business expectancy was justified.

---

[18] *Howard*, 81 S.W.3d at 114 (citations omitted).

"Absence of justification refers to the absence of a legal right to justify actions taken."[19] The absence of justification element is not met "if the action complained of was an act which the defendant had a definite legal right to do without any qualification."[20]

> If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his or her own interests.  "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law."[21]

Tank argues that it had a legal right to submit its qualification package in order to bid on the Project, which included certain representations about Ducotey and Whalen's experience, and that the Amended Complaint fails to allege facts that Tank used improper means.  LaForge argues that there are no facts alleged that specify how he used improper means to submit the qualification package.  CST responds that Defendants did not have a legal right to submit a qualification package that included misrepresentations of fact and utilized CST's trade secrets and confidential information.  CST further argues that it is entitled to an inference that LaForge knew that Ducotey and Whalen's qualifications were misrepresented in the qualification package since he collaborated on it with them.

The Court agrees with CST that the Amended Complaint alleges sufficient facts to support the absence of justification element of its claim against Tank.  While Tank certainly had a legitimate economic interest in bidding on the Project, CST alleges that Tank used improper means by including misrepresentation of fact and CST's confidential information in preparing its

---

[19] *Downey v. McKee*, 218 S.W.3d 492, 497 (Mo. Ct. App. 2007) (citation omitted).

[20] *Creative Compounds, LLC v. ThermoLife Int'l, LLC*, 669 S.W.3d 330, 341 (Mo. Ct. App. 2023) (quoting *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. 2006) (en banc)).

[21] *Farrow v. St. Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. 2013) (quoting *W. Blue Print Co., v. Roberts*, 367 S.W.3d 7, 19 (Mo. 2012) (en banc)).

qualification package and submitting information to the City in order to obtain the City's

approval.  The Court must assume the truth of these facts at this stage of the litigation.

As for LaForge, he contends that the facts alleged paragraphs 72–74 of the Amended

Complaint tying him to the qualification package are insufficient:

> 72.     In sworn interrogatory responses submitted by Tank
> Connection in this action, Tank Connection identifies Casey
> Whalen, Steve Ducotey, and Jordan LaForge as persons "who
> prepared the Summary of Experience for the invitation to bid on
> the Byrd Park Reservoir Rehabilitation."
>
> 73.     These same persons were also identified by Tank
> Connection as being "involved in the drafting, creation (including
> editing), and submission of Tank Connection's pre-qualification
> and qualification package(s) concerning the Byrd Park Project."
>
> 74.     When asked about each person's role in the submission,
> Tank Connection stated that there was a "collaborative effort" by
> each person.[22]

LaForge argues that the Court cannot draw a reasonable inference based on these facts that he

knowingly misrepresented facts, or knowingly used CST's trade secrets, in preparing the

prequalification and qualification packages for the Project on behalf of Tank.

The Court agrees with CST that a reasonable inference can be drawn from the facts

alleged that LaForge knowingly misrepresented certain facts in the qualification package.  Again,

at this stage, the standard requires the Court to assume the truth of the facts alleged and to draw

all reasonable inferences therefrom.  If LaForge collaborated with Ducotey and Whalen in

preparing their list of experience for the qualification packages, it is reasonable to infer that

LaForge knew that the list included misrepresentations of fact, and that he was motivated to

---

[22] Doc. 38 ¶¶ 72–74.

include them in order for Tank to obtain the subcontract.  The Court therefore denies both

motions to dismiss Count III under Rule 12(b)(6).

### B.    DTSA Claim (Count II)

Count II alleges that Tank misappropriated CST's trade secrets under the DTSA.  The

elements required to establish this claim are: "(1) the existence of a trade secret; (2) the

acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual

acquiring, using, or disclosing the trade secret knew or should have known the trade secret was

acquired by improper means."[23]  "Under the DTSA, the trade secret must also 'relate[] to a

product or service used in, or intended for use in, interstate or foreign commerce.'"[24]  Tank

moves to dismiss this claim for failure to sufficiently allege the existence of trade secrets under

the DTSA, or that Tank misappropriated CST's trade secrets.

### 1.    Trade Secrets

Trade secrets under the DTSA are "all forms and types of financial, business, scientific,

technical, economic, or engineering information" if the owner takes "reasonable measures to

keep such information secret" and "the information derives independent economic value . . .

from [that information] not being generally known to, and not being readily ascertainable

through proper means by, another person."[25]  Whether a trade secret exists "is a question for the

trier of fact."[26]  CST "need not plead its trade secrets in detail.  Yet, the trade secret must be

---

[23] *API Ams. Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148 (D. Kan. 2019) (citation omitted).

[24] *Id.* at 1148 n.4 (alteration omitted) (citations omitted) (quoting 18 U.S.C. § 1836(b)(1)).

[25] 18 U.S.C. § 1839(3)(A)–(B).

[26] *Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004) (citation omitted).

defined with enough precision to separate it from general skill and knowledge possessed by others."[27]

CST identifies as trade secrets "the actual design of the column supported covers," and the "documents created by CST to efficiently and correctly calculate loads using CST's methods."[28]  The Amended Complaint acknowledges that other companies know how to design column-supported triangulated aluminum roofs like the ones required on the Project.  Given this concession, Tank argues that CST fails to sufficiently allege trade secrets beyond the general skill and knowledge of others.  The Court finds that CST has fulfilled its burden of alleging facts to support the trade secrets element of this claim by identifying the trade secrets as the actual design and method of calculating lateral loads.  While it may be true that there are various ways to design and manufacture the type of roof required for the Byrd Park Project, to the extent CST identifies its own designs as the trade secret, that would go beyond the general skill and knowledge of others in the field.  Similarly, CST sufficiently alleges that its load calculation method is a trade secret.

### 2.    Misappropriation

Next, Tank argues that CST fails to allege facts to support a plausible claim that Tank misappropriated the identified trade secrets.  Misappropriation occurs when a non-owner acquires the trade secret "who knows or has reason to know that the trade secret was acquired by improper means," or when a non-owner discloses or uses a trade secret "without express or

---

[27] *Servi-Tech, Inc. v. Burmeister*, No. 16-1130-EFM-GLR, 2016 WL 5944502, at *5 (D. Kan. Oct. 13, 2016) (citing *Bradbury Co. v. Tessier-duCros*, 413 F. Supp. 2d 1209, 1220–21 (D. Kan. 2006)).

[28] Doc. 38 ¶ 184.

implied consent."[29]  The fact that Ducotey and Whalen went to work for CST's competitor is insufficient, standing alone, to "plausibly suggest misappropriation, inevitably or otherwise."[30]

CST alleges the following facts in support of the misappropriation element of this claim:

> 191.    Upon information and belief, Mr. Ducotey acquired, used, or disclosed the Trade Secrets to Tank Connection and Crowder without consent.
>
> . . . .
>
> 193.    Tank Connection and Crowder knew or should have known the Trade Secrets were acquired by Mr. Ducotey by improper means.
>
> . . . .
>
> 200.    Without actual experience with triangulated, rectangular, flat column supported roof systems the only way Mr. Ducotey, and thus Tank Connection, can make a roof of the type required by the Byrd Park Project is through acquiring the Trade Secrets by improper means.[31]

CST also alleges that Ducotey and Whalen breached their employment agreements by giving confidential information to Tank.

CST argues that it sufficiently alleges misappropriation because the Amended Complaint states that Ducotey and Whalen accessed the trade secrets in breach of their employment agreements, and that Tank knew or should have known that the information was acquired by improper means.  But none of the paragraphs identified by Tank include facts that directly support its acquisition of the specific trade secrets identified above.  Instead, the facts alleged in the Amended Complaint require the Court to draw an inference that because Ducotey and

---

[29] 18 U.S.C. § 1839(5)(A) & (B).

[30] *CGB Diversified Servs., Inc. v. Adams*, No. 2:20-CV-2061-HLT-KGG, 2020 WL 1847733, at *3 (D. Kan. Apr. 13, 2020).

[31] Doc. 38 ¶¶ 191, 193, 200.

Whalen had access to the trade secrets when they worked for CST, and because Tank had no previous experience manufacturing and installing triangulated, rectangular, flat column supported roof systems, Ducotey and Whalen must have shared CST's design documents and load calculation information with Tank.

But the Court cannot draw this inference on the facts alleged. CST's allegations that Ducotey and Whalen "had access to trade secrets as part of [their] employment with [CST], that [they] accessed that information, and that [they] went to work for a competitor" are insufficient in order to reasonably infer wrongdoing.[32] Similarly, the fact that Tank had not previously manufactured the roof design needed for the Project does not, on its own, allow for a reasonable inference that it must have acquired CST's trade secrets to be approved by the City. There are simply no facts alleged to support a reasonable inference that Tank acquired CST's designs and load calculation method through Ducotey and Whalen and used them on the Byrd Park Project.

CST asserts in the response that "[t]he qualification package, and subsequent materials provided by Tank Connection to the City, included pictures of projects completed by CST— using CST's trade secrets—and misrepresentations about Tank Connection's proposed team's involvement with those projects."[33] But the paragraphs in the Amended Complaint cited for this proposition do not support CST's argument. To be sure, those paragraphs allege that Ducotey and Whalen misrepresented their CST experience by including pictures of past CST projects and falsely associating themselves with their design and completion. But those paragraphs do not state that Ducotey and Whalen used the alleged trade secrets—design documents and load

---

[32] *Adams*, 2020 WL 1847733, at *4.

[33] Doc. 87 at 2.

calculation methods—in the qualification package that was submitted to general contractors and the City.

Accordingly, the Court grants Tank's motion to dismiss Count II because it does not state a plausible claim that Tank misappropriated CST's trade secrets.

### C.      Civil Conspiracy (Count IV)

Tank moves to dismiss the civil conspiracy claim to the extent it is based on the facts alleged in Count 1—tortious interference with existing contract.  For the same reasons it argues the Court should dismiss that claim, it argues the Court should dismiss the conspiracy claim. The Court denies Tank's motion because it has determined that CST's allegations in support of Count I sufficiently state a plausible claim upon which relief can be granted.

### D.      Aiding and Abetting (Count V)

In Count V, CST alleges a claim of aiding and abetting against Tank and Crowder. Specifically, CST alleges that Tank and Crowder devised a "common design" to replace CST with Tank as the roof subcontractor on the Project by submitting Tank's false and misleading qualification package.  CST also alleges that Crowder and Tank "schemed to interfere with the CST Employment Agreements by substantially assisting and/or encouraging Mr. Ducotey and Mr. Whalen to furnish Tank Connection and Crowder with confidential information necessary for Tank Connection to construct triangulated, rectangular, flat column supported roof structures, necessary for the Project."[34]

Tank moves to dismiss Count V because Missouri does not recognize an independent common law tort claim for aiding and abetting under § 876 of the Restatement (Second) of Torts. CST responds that Missouri courts have recognized aiding and abetting liability in some

---

[34] Doc. 38 ¶ 235.

circumstances and the Court should allow this claim to proceed.  Because this Court is "called upon to interpret state law, [it] must look to rulings of the highest state court" to guide its interpretation.[35]  If the highest state court has not ruled on the issue, the Court must "predict how [that court] would rule after giving proper regard to relevant rulings of other courts of the State."[36]  The Court "may also consider 'appellate decisions in other states with similar legal principles . . . and the general weight and trend of authority in the relevant area of law.'"[37]

Under § 876 of the Restatement (Second) of Torts, secondary liability lies if one:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.[38]

Subsection (a) of the Restatement governs civil conspiracy claims, and is therefore inapplicable to this Court's analysis.[39]  The Missouri Supreme Court has recognized this civil conspiracy

---

[35] *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quoting *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007)).

[36] *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 765 (10th Cir. 2019) (quoting *Stickley*, 505 F.3d at 1077).

[37] *Amparan*, 882 F.3d at 948 (alteration in original) (quoting *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007)).

[38] *Shelter Mut. Ins. Co. v. White*, 930 S.W.2d 1 (Mo. Ct. App. 1996) (quoting Restatement (Second) of Torts § 876 (1979)).

[39] *See, e.g.*, *Gettings v. Farr*, 41 S.W.3d 539, 542–43 (Mo. Ct. App. 2001); *Jo Ann Howard & Assocs. v. Cassity*, No. 09CV01252 ERW, 2012 WL 3984486, at *8 (E.D. Mo. Sept. 11, 2012).

theory of liability,[40] but it has not recognized an independent tort claim based on aiding-and-abetting liability under subsections (b) or (c) the Restatement.[41]

CST's citation to the Missouri Supreme Court's recent decision in *Matthews v. Harley-Davidson*[42] is inapposite.  That case considered a statutory aiding and abetting theory of liability under the Missouri Human Rights Act.[43]  It says nothing about aiding and abetting as a common law tort theory; therefore, CST's statement that *Matthews* "guts" prior caselaw is an overstatement.[44]

The federal district court for the Eastern District of Missouri considered this issue in *Jo Ann Howard & Associates, P.C. v. Cassity*,[45] and extensively reviewed the Missouri Court of Appeals' decisions that discuss and apply § 876.  In granting a motion to dismiss aiding-and-abetting claims, the court accurately summarized the Missouri state courts' jurisprudence on the Restatement as follows:

> In sum, Missouri state courts, including the state's highest court, have recognized the civil conspiracy theory of liability set forth in § 876(a).  Several Missouri courts have flatly rejected the application of § 876(c), and others have acknowledged its rejection.  Missouri intermediate appellate courts have reached opposing holdings on the application of § 876(b); and the most recent decision of the state's intermediate appellate courts has indicated that the only civil conspiracy doctrine recognized and applied in Missouri is the theory described in § 876(a).  Of the Missouri appellate court decisions addressing the issue, only the *Shelter Mutual* decision concluded that Missouri's highest state court would recognize the secondary liability theories set forth in § 876(b) or (c).  In view of the holdings in all these decisions, this

---

[40] *See Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo. 1984) (en banc).

[41] *See, e.g., Cardinal Health 110, LLC v. Premiere Healthcare, LLC*, No. 18 CV 165 ACL, 2019 WL 108837, at *6 (E.D. Mo. Jan. 4, 2019) (citation omitted).

[42] 685 S.W.3d 360 (Mo. 2024) (en banc).

[43] *Id.* at 369 (citing Mo. Rev. Stat. § 213.070.1(1)).

[44] *See* Doc. 87 at 16.

[45] No. 09CV01252 ERW, 2012 WL 3984486 (E.D. Mo. Sept. 11, 2012).

> Court predicts that the Missouri Supreme Court would decline to adopt the theory of liability presented by either § 876(b), or § 876(c).[46]

That case proceeded to trial and was eventually appealed to the Eighth Circuit Court of Appeals, including its prediction that the Missouri Supreme Court would decline to adopt the theories of liability in § 876(b) and (c).  After reviewing Missouri law on the issue, and acknowledging some contrary authority to the district court's ruling, the Eighth Circuit stated that it was "left with little guidance in an uncertain area."[47]  But because there was no clear indication that the Missouri Supreme Court would recognize a cause of action based on § 876(b) or (c), at least on the facts of that case, the court declined to expand aiding-and-abetting liability in that context— "us[ing] aiding-and-abetting liability to circumvent the limitations of trust law by holding [the defendant] liable in tort for essentially the same conduct that constitutes a breach of trust."[48]

This Court is persuaded by the reasoning in *Jo Ann Howard*, and reaches the same conclusion under the facts of this case.  CST provides little argument on this issue, but offers two other federal court cases that declined to dismiss aiding-and-abetting claims as a matter of law.  First, in *Lonergan v. Bank of America, N.A.*, the Western District of Missouri surveyed several Missouri Court of Appeals' cases, and determined that the defendant "ha[d] not shown that, as a matter of law, aiding and abetting liability does not exist for torts in Missouri."[49]  The court did not address *Jo Ann Howard*, nor did it discuss several of the cases reviewed in that case.  Instead,

---

[46] *Id.* at *10 (citations omitted) (collecting cases).

[47] *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 651 (8th Cir. 2017).

[48] *Id.*

[49] No. 12-CV-04226, 2013 WL 176024, at *12 (W.D. Mo. Jan. 16, 2013).

the *Lonergan* decision primarily relied on the Missouri Court of Appeals' 1995 decision in *Bradley v. Ray*.[50]

This Court respectfully disagrees that the *Bradley* decision supports a prediction that the Missouri Supreme Court would recognize an independent claim for aiding and abetting based on § 876(b) or (c) of the Restatement.  In *Bradley*, the Missouri Court of Appeals affirmed dismissal of certain defendants on the theory that they "affirmatively acted by giving substantial assistance or encouragement to" the primary tortfeasor in a case alleging intentional child abuse.[51]  In so holding, the court explained:

> Plaintiff has not cited any Missouri case which recognizes a claim for aiding and abetting in the commission of a tort, and none were located through the Court's own research.  Even were this cause of action recognized, however, plaintiff did not plead facts which support a claim of aiding and abetting against defendants.[52]

The court stated in a footnote that "[w]hile no Missouri courts have recognized a tort based on Restatement (Second) of Torts § 876(b), Missouri courts have rejected claims fashioned after the Restatement (Second) of Torts § 876(c)."[53]

The *Lonergan* court declined to dismiss an aiding-and-abetting claim, relying in large part on the fact that the *Bradley* court considered whether the plaintiff alleged sufficient facts to support an aiding-and-abetting claim, assuming one exists.[54]  This Court, like the court in *Jo Ann Howard*, reads *Bradley* to hold that no such cause of action has been recognized in Missouri. *Bradley*'s discussion of whether the plaintiff alleged sufficient facts to support an aiding-and-

---

[50] 904 S.W.2d 302 (Mo. Ct. App. 1995).

[51] *Id.* at 314–15.

[52] *Id.* at 315 (footnote omitted).

[53] *Id.* at 315 n.11 (citing *Richardson v. Holland*, 741 S.W.2d 751, 754 (Mo. Ct. App. 1987)).

[54] *Id.* at 315.

abetting claim was merely an additional reason to affirm dismissal, not an extension of aiding-and-abetting cause of action.[55]

Second, CST points the Court to *Aguilar v. PNC Bank, N.A.*[56]  *Aguilar* relied in part on *Lonergan* and the *Lonergan* court's analysis of *Bradley* in predicting that the Missouri Supreme Court would recognize a claim for aiding and abetting a breach of fiduciary duty.[57]  As described above, the Court respectfully disagrees with that court's reading of *Bradley*.  The *Aguilar* court also cited several aged cases for the proposition that "Missouri courts have recognized aiding and abetting claims in several cases."[58]  This Court does not agree that the cases cited in the *Aguilar* decision support an aiding-and-abetting theory in this case.  These cases specifically applied aiding-and-abetting liability to trespass and assault claims.[59]  They do not stand for the proposition that an aiding-and-abetting claim is available under Missouri law for all torts.  And these cases do not discuss the Restatement.  Moreover, of the more recent Missouri state court cases to discuss this issue, only one has concluded that the Missouri Supreme Court would recognize liability under the Restatement (Second) § 876(b) or (c).[60]

---

[55] *See Jo Ann Howard & Assocs. v. Cassity*, No. 09CV01252, 2012 WL 3984486, at *9 (E.D. Mo. Sept. 11, 2012) (relying in part on language in the *Bradley* decision "that Missouri courts had rejected claims fashioned after § 876(c)").

[56] No. 14-CV-985, 2014 WL 12700618 (E.D. Mo. Nov. 19, 2014).

[57] *Id.* at *4; *see also Enslein v. Di Mase*, No. 16-09020-CV-W-ODS, 2017 WL 3129812, at *5 (W.D. Mo. July 21, 2017) (relying on *Lonergan* and *Aguilar* to find that Missouri would recognize an aiding and abetting breach of fiduciary duty claim).

[58] *Aguilar*, 2014 WL 12700618, at *4 (first citing *Curlee v. Donaldson*, 233 S.W.2d 746, 752-55 (Mo. Ct. App. 1950); then citing *Knight v. W. Auto Supply Co.*, 193 S.W.2d 771, 776 (Mo. Ct. App. 1946); and then citing *Cooper v. Mass. Bonding & Ins. Co.*, 186 S.W.2d 549, 551 (Mo. Ct. App. 1944)).

[59] *See Curlee*, 233 S.W.2d at 753 ("The rule is well established that 'one who aids, abets, assists, or advises the trespasser in committing a trespass, is equally as liable as the one who does the act, himself.'" (citations omitted)); *Cooper*, 186 S.W.2d at 551; *Knight*, 193 S.W.2d at 776 (allowing assault case to be tried on aiding and abetting theory based on 15 C.J.S. Conspiracy § 30).

[60] *See Richardson v. Holland*, 741 S.W.2d 751, 754 (Mo. Ct. App. 1987) (holding that subsection (c) "has not been adopted as the law in this state," and rejecting the idea of secondary liability in the product liability context where an act of the defendant is not the proximate cause of the plaintiff's injury); *Bradley v. Ray*, 904 S.W.2d 302, 315 n.11 (Mo. Ct. App. 1995) (finding no authority recognizing an aiding and abetting claim under Missouri law

The Court is persuaded by the reasoning of *Jo Ann Howard*, and subsequent federal cases that have followed it,[61] that the Missouri Supreme Court would not recognize an independent tort claim based on "substantial assistance or encouragement" like the claims alleged in this case. Moreover, the Court finds it prudent to follow the Eighth Circuit's guidance in the *Jo Ann Howard* appeal to "exercise[] caution in expanding state-law theories of liability that are not foreshadowed by state precedent."[62]  Similar to that case, CST here asks the Court to extend aiding and abetting liability in a new context.  None of the cases cited by CST considers aiding and abetting in the context of tortious interference with existing or prospective contracts. Accordingly, the Court predicts that the Missouri Supreme Court would not expand this theory of liability under the facts of this case, and agrees with Tank that this claim should be dismissed.

**IT IS THEREFORE ORDERED BY THE COURT** that Tank's Motion to Dismiss (Doc. 57) is **granted in part and denied in part**.  Counts II and V are dismissed; the motion is otherwise denied.   LaForge's Motion to Dismiss (Doc. 59) is **denied**.

**IT IS SO ORDERED.**

Dated: July 9, 2024

---

and acknowledging that Missouri courts have "rejected" § 876(c) claims); *Shelter Mut. Ins. Co. v. White*, 930 S.W.2d 1, 3–5 (Mo. Ct. App. 1996) (finding that passenger defendants could be liable under an encouragement theory based on § 876 where the facts alleged that they "encourage[ed] [the driver] to speed, to ignore traffic signs, and to drive under liquor's influence—conduct which a jury could reasonably conclude was known by the passengers to be tortious."); *see also Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 650–51 (8th Cir. 2017) (suggesting that *Shelter Mutual* misinterpreted the Missouri Supreme Court's decision in *Zafft v. Eli Lilly & Co.,* 676 S.W.2d 241 (Mo. 1984) (en banc) in reaching its conclusion).

[61] *See Blair v. City of Hannibal*, 179 F. Supp. 3d 901, 915 (E.D. Mo. 2016); *Cardinal Health 110, LLC v. Premiere Healthcare, LLC*, No. 1:18 CV 165 ACL, 2019 WL 108837, at *7 (E.D. Mo. Jan. 4, 2019); *Blaes v. Johnson & Johnson*, 71 F. Supp. 3d 944, 947–48 (E.D. Mo. 2014); *In re Patriot Nat'l Inc.*, 592 B.R. 560, 580–81 (Bankr. D. Del. 2018).

[62] *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 651 (8th Cir. 2017); *see also In re Patriot Nat'l Inc.*, 592 B.R. at 582.

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE