IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CST INDUSTRIES, INC.,

      Plaintiff,

      v.                                                                 Case No. 23-2339-JAR-RES

TANK CONNECTION, L.L.C., et al.,

      Defendants.

## MEMORANDUM AND ORDER

This case involves two business rivals seeking to become the roof subcontractor for a large municipal project involving the City of Richmond, Virginia's drinking water reservoir. Plaintiff CST Industries, Inc. ("CST") brings claims against its competitor Tank Connection, L.L.C. ("Tank"); Tank's Liquid Market Manager, Jordan LaForge; and the project's general contractor, Crowder Construction, Inc. ("Crowder"). The claims are tortious interference with a contract against Tank; tortious interference with a business expectancy against Tank and LaForge; unfair competition against Tank, LaForge, and Crowder; and civil conspiracy against Tank and Crowder.[1] Before the Court are Crowder's Motion for Summary Judgment (Doc. 398), Tank and LaForge's Motion for Summary Judgment (Doc. 416), and CST's Motion for Partial Summary Judgment (Doc. 411).[2] The motions are fully briefed, and the Court is prepared to

---

[1] Doc. 397.

[2] CST makes two ancillary motions; both are denied as moot. First, CST moves to strike Crowder's additional statement of facts in its reply or in the alternative, to grant leave to file a surreply. Doc. 525. Because the Court resolves the summary-judgment motions without relying on Crowder's additional statement of facts or Crowder's arguments based on them, the Court denies the motion as moot. Second, CST moves to correct its Motion for Partial Summary Judgment (Doc. 411). Doc. 499. To decide the summary-judgment motions, the Court does not rely on the citations that CST moves to correct, so the Court denies the motion as moot.

rule.  For the reasons explained below, the Court grants summary judgment for Crowder, Tank, and LaForge.

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  In applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[6]

The moving party must initially show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

---

[3] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy this burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[12]  "Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

---

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Celotex*, 477 U.S. at 324.

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (2000); *see also Kannady*, 590 F.3d at 1169.

[12] *Adams*, 233 F.3d at 1246 (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.3d 1022, 1024 (10th Cir. 1992)).

[13] *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997).

[14] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

## II. Undisputed Facts

The following facts are either uncontroverted, stipulated to in the Pretrial Order,[16] or viewed in the light most favorable to the nonmovant.[17]

### *CST'S Bid*

The facts of this case relate to the City of Richmond, Virginia's ("the City") endeavor to rehabilitate two large drinking-water reservoirs at Byrd Park ("Byrd Park Project"). Those reservoirs needed new roofs. The general contractor would need to demolish the concrete covers on both reservoirs, rehabilitate the tanks, and then put new roofs on each one. The City specified that the roofs must utilize a triangulated, rectangular, flat, column-supported roof system—a unique roof design in the industry.

Crowder is a general contractor and also one of the City's prequalified bidders for the Byrd Park Project. It submitted a bid to be the general contractor for the Byrd Park Project in March 2022. But Crowder could not perform the roof design, manufacture, and installation itself, so it would require a subcontractor and would incorporate the subcontractor's bid into its bid to the City. As is typical, the general contractor would be responsible for awarding the subcontract, so the subcontractor would contract with the general contractor, not directly with the City.[18]

---

[16] Doc. 397 at 3–5.

[17] Though the record here is extensive, the Court includes only those facts material to deciding the summary-judgment motions. The Court also collates the undisputed facts from the three motions in this single fact section, but when ruling on the motions, the Court relies only on those undisputed facts that each motion raises as undisputed facts. For example, the Court does not use Crowder's statement of facts in addressing Tank's motion for summary judgment, even though the Court includes all undisputed facts in this fact section.

[18] *See* Doc. 419-17 at 24, § 1.16 ("Subcontractor means a . . . corporation to whom the Contractor, with written consent of the Owner, sublets part of the work. A Subcontractor has no contractual relationship with the Owner.").

CST is a subcontractor that manufactures and constructs factory-coated metal storage tanks and silos, aluminum domes, and specialty covers.  It was one of three roof subcontractors prequalified by the City to work on the Byrd Park Project.  CST had engineering and installation experience with the triangulated, rectangular, flat, column-support roof systems required for the project; it had built approximately twelve such structures before the Byrd Park Project.  And CST had worked with the City before.  It had completed an earlier project for the City in 2010 and even helped the City and its engineers write the roof specifications for the Byrd Park Project.

CST submitted its proposed subcontract and bid for the roofing project to Crowder. CST was one of three subcontractors prequalified by the City for the Byrd Park Project; the other two were United Industries Group, Inc. and Ultraflote.  And despite submitting the bid with the highest price, Crowder selected CST in March 2022 to be the subcontractor to design, manufacture, and install the roof covers, and incorporated CST's bid price into its bid to the City. A few months later, Crowder issued a letter of intent to CST, indicating its intent to issue the subcontract to CST for the triangulated, aluminum, flat roof system for the Byrd Park Project. That letter of intent noted, however, that the subcontract was contingent upon Crowder and CST's "mutual[] agree[ment] upon terms and conditions."[19]

In September 2022, CST and Crowder's representatives began to negotiate those terms and conditions for the subcontract.  But they reached an impasse.   In October 2022, Crowder sent CST an executable subcontract for the Byrd Park Project, which included language requiring a full performance and payment bond from CST for the project.  CST responded that its "bonding capacity is extremely limited," and it would "prefer not to bond."[20]  CST was "never

---

[19] Doc. 400-25 at 3.

[20] Doc. 400-28 at 3.

willing to do the full bond."[21]  So after much back and forth, which the Court does not recount here because it is not material to deciding these summary-judgment motions, Crowder began looking at other subcontractors for the project.

### Crowder Reaches Out to Tank

Tank is also a subcontractor that designs, manufactures, and installs steel storage tanks and silos, composite pedestal storage designs, and domes and covers.  Tank, however, was not one of the City's prequalified subcontractors, so to win the subcontract, it would need to be approved by the City.  And that would require Tank to demonstrate that it was an "or equal" manufacturer—that is, Tank would need to show that it was equal to the prequalified subcontractors in that it could perform the work required for the Byrd Park Project.  Though Tank did not have experience with triangulated, rectangular, flat, column-supported roof systems, it nevertheless believed that it could qualify through its experience with similar projects and—as most relevant here—through leveraging the experience of two of its employees, Steve Ducotey and Casey Whalen.

Ducotey and Whalen gained that experience while working for their previous employer—CST.  While at CST, each signed restrictive covenants.  Ducotey agreed to a nondisclosure agreement, in which he agreed (1) that "all Confidential Information shall remain and be the sole and exclusive property of the Company" and (2) that he would "hold all Confidential Information in strictest confidence and not, directly or indirectly, disclose or divulge any Confidential Information to any person other than an officer, director, or employee of the Company."[22]  When Whalen left CST, he signed a similar nondisclosure agreement: he agreed

---

[21] Mueller Dep., Doc. 400-4 at 146:3–5.

[22] Doc. 419-7 at 2–3.

not to disclose CST's confidential information.  Whalen has continued to possess some of CST's business information while employed by Tank.  He has, for example, circulated a CST inspection checklist and CST manuals on installation and maintenance.

### *Approval by the City*

Before Crowder could issue a subcontract to Tank, the City needed to approve Tank as an "or equal" manufacturer.  And the first step in gaining that approval was for Tank to prepare a Qualifications Package.[23]  The Qualifications Package included extensive information about Tank's qualifications for the project, but most relevant to this case, it included a summary of Ducotey's experience.  The summary explained that Ducotey had been employed by Conservatek (which was acquired by CST) and CST "for 31 years from 1985 to 2016."[24]  The summary further explained some of his accomplishments with those businesses: he "designed Conservatek's first low-profile column supported dome roof"; "developed and created CST's current dome product line named Optidome"; "developed CST's extruded flat cover product"; and "wrote the latest version of the dome design software for Conservatek."[25]  Along with that information, the summary attached four pictures of various roofs that Ducotey took from CST's website; each picture had a caption.

- Picture One: "Figure 1- 285' Diameter Column Supported Flat Dome"

- Picture Two: "Figure 2- Column Supported Rectangular Cover"

- Picture Three: "Figure 3- Column Supported Rectangular Cover"

- Picture Four: "Barrel Vault Structure."

---

[23] Tank prepared the Qualifications Package, but Crowder submitted it to the City.

[24] Doc. 483-17 at 89.

[25] *Id.*

Those captions described each project, but none explicitly identified the projects as Tank projects.

In December 2022, Crowder submitted the Qualifications Package to the City on behalf of Tank. In its submission to the City, Crowder explained its reason for submitting Tank as an "or equal" manufacturer: "[t]he main reason Crowder is proposing this manufacturer is because they can bond 100% of their work while the manufacturers named in the specification cannot."[26] It also explained that it wanted to "understand if Tank Connection is considered technically qualified."[27] Crowder also certified that it had "reviewed, checked, and approved [the submittal] for compliance with the Contract Documents."[28] Moreover, by submitting the "or equal" proposal, Crowder certified that it had "personally investigated proposed product and determined that it is equal or superior in all respects to that specified . . . [and] will provide the same guarantee for the 'or equal' manufacturer as for product specified."[29]

After submission of the Qualifications Package, the City followed up with a letter seeking clarifications about some information in the submission. One of the inquiries focused on Ducotey's experience: "this submittal . . . does appear to indicate that [Ducotey] ha[s] CST past experience . . . with triangulated, rectangular flat, column supported roofs. Submittal however only shows photographs of roof but does not indicate that Mr. Ducotey worked on them and if he did in what capacity."[30] Tank then responded with a clarification letter. It noted that Ducotey had been "involved with/oversaw the design and manufacturing of multiple 'Like' projects with

---

[26] Doc. 483-17 at 4.

[27] *Id.*

[28] *Id.*

[29] Doc. 413-12 at 178, § 1.4.D.1.f.(1).

[30] Doc. 483-9 at 2.

similar designs throughout his career" and listed several additional projects not originally included in the original submission.[31]  Tank also explained that Ducotey gained his "experience working on/overseeing" those projects "while working for CST Covers/Conservatek as their VP of Engineering."[32]

After those clarifications, the City approved Tank as an "or equal" manufacturer, though subject to several conditions.  The relevant ones here were that (1) "Crowder has completed a detailed review of Tank Connections' qualifications and capacity to complete this project on time and within budget"; (2) Tank's "design team shall include key team members with similar experience . . . from previous work with CST as indicated in the attached project team qualification submittal"; and (3) Crowder would "provide[] a Tank Connection design team submittal for City review and approval which shows compliance with [condition (2)]."[33]

Crowder then acted to satisfy those conditions.  First, it submitted its proposed design team, which included Ducotey's summary of experience; it was identical to the summary of experience included in the Qualifications Package.[34]  The City approved this submittal, noting that Ducotey appeared to have "similar experience" with the unique roof system "from previous work with Conservatek and the CST."[35]  Second, Crowder acknowledged that it had completed a "detailed review of Tank Connections' qualifications and capacity to complete [the] project on time and within budget."[36]

---

[31] Doc. 420-16 at 24.

[32] *Id.* at 25.

[33] Doc. 420-22 at 3.

[34] *See* Doc. 483-13 at 11.

[35] *Id.* at 2.

[36] Doc. 483-12 at 22.

With those conditions satisfied, the City finally approved Tank as a subcontractor for the Byrd Park Project in April 2023.[37]  Tank has now replaced CST as the subcontractor for the manufacture and installation of the roof system for the project.

In addition to the Byrd Park Project, Tank has also used Ducotey's summary of experience for bids on at least two other projects in Nevada and Hawaii.[38]

## III.  Discussion

CST brings several claims: (1) tortious interference with contract against Tank, (2) tortious interference with business expectancy against LaForge and Tank, (3) unfair competition against Tank, LaForge, and Crowder, and (4) civil conspiracy against Tank and Crowder.[39]  Each Defendant moves for summary judgment on the claims against it, and CST crossmoves for summary judgment on its claims for tortious interference with a business expectancy and unfair competition.  Neither party disputes that Kansas's choice-of law-rules select Missouri law because that is where CST has its principal place of business and thus where it felt the financial harm.[40]  The Court therefore applies Missouri law for all claims.  The Court first addresses tortious interference with contract, then tortious interference with business expectancy, next unfair competition, and finally civil conspiracy.

---

[37] Doc. 400-40 at 2.

[38] The parties contest whether Tank has made similar representations for additional projects in New Mexico and Florida.

[39] Civil conspiracy is not technically a stand-alone claim; it is a manner of imposing joint and several liability on a conspiring tortfeasor for a tort committed by another.  *Higgins v. Ferrari*, 474 S.W.3d 630, 642 (Mo. Ct. App. 2015) (citing *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 22 (Mo. 2012)).

[40] *See Snyder Ins. Servs. v. Kulin-Sohn Ins. Agency*, No. 16-2535, 2018 WL 2722500, at *2 n.2 (D. Kan. June 6, 2018).

## A.  Tortious Interference with a Contract (against Tank)

CST sues Tank for tortiously interfering with Ducotey's and Whalen's nondisclosure agreements with CST.  Tortious interference with a contract requires the plaintiff to show (1) "a contract," (2) "defendant's knowledge of the contract," (3) "a breach induced or caused by defendant's intentional interference," (4) "absence of justification," and (5) "damages."[41]  Tank argues that it is entitled to summary judgment because CST has failed to make its required showing on elements two, three, and four.  The Court agrees that CST has failed to show a genuine dispute of material fact on element four—that Tank acted without justification—and therefore, need not address elements two and three.  Tank is therefore entitled summary judgment on the claim for tortious interference with contract.

CST fails to show that Tank acted without justification.  Interference with contract is only actionable if the defendant interferes without justification.[42]  And a party is justified if she possesses a legal right to do the interfering act.[43]  Often, one has a legal right to purse a legitimate economic interest.[44]  But only up to a point: the party may not employ "improper means" to "further his interest and to the plaintiff's detriment."  So to show an absence of justification, the plaintiff "must show that the defendant employed improper means in seeking to further only his own interests."[45]

---

[41] *Creative Compounds, LLC v. ThermoLife Int'l, LLC*, 669 S.W.3d 330, 339–40 (Mo. Ct. App. 2023) (quoting *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. 2017)).

[42] *Id.*

[43] *W. Blue Print Co., v. Roberts*, 367 S.W.3d 7, 20 (Mo. 2012) (quoting *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 590 (Mo. Ct. App. 2008)).

[44] *Id.* (citing *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. 2006)).

[45] *Clinch v. Heartland Health*, 187 S.W.3d 10, 16 (Mo. Ct. App. 2006) (internal quotation marks omitted) (quoting *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303 (Mo. 1993)).

Those improper means may be "threats, violence, trespass, defamation, misrepresentation of fact, [or] restraint of trade."[46]  But whatever they are, they must be an "independently wrongful" act.[47]  In other words, the defendant must commit some act that is wrongful independent of the breach itself.  So where a plaintiff brings a claim for tortious interference with a contract, the improper means cannot be the inducement or breach itself; they must be *independently* wrongful.[48]

So here, CST must show that Tank induced Ducotey's and Whalen's breaches using improper means, and those means must be wrongful independent of the inducement or breach. But the undisputed facts show that Tank used no improper means to induce a breach of the nondisclosure agreements.[49]  The contracts interfered with are Whalen's and Ducotey's nondisclosure agreements, under which they agreed not to disclose any of CST's confidential information during subsequent employment.  CST argues that both Whalen and Ducotey disclosed CST's business information while employed by Tank.

But even if Whalen and Ducotey breached their nondisclosure agreements by disclosing confidential information, CST fails to show that Tank induced them through improper means to disclose it.  CST offers no evidence that Tank induced Whalen or Ducotey through "threats, violence, trespass, defamation, misrepresentation of fact, or any other wrongful act."[50]  Instead, CST stakes its entire claim on this argument: that the improper means was inducing Whalen and

---

[46] *Pinebrook Holdings, LLC v. Narup*, No. 19-CV-1562, 2022 WL 1773057, at *11 (E.D. Mo. June 1, 2022) (quoting *Stehno*, 186 S.W.3d at 252)).

[47] *Creative Compounds*, 669 S.W.3d at 339–40 (quoting *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. 2017)).

[48] *EnviroPAK Corp. v. Zenfinity Capital, LLC*, No. 14CV00754, 2015 WL 331807, at *8 (E.D. Mo. Jan. 23, 2015) (finding that plaintiff failed to state a claim when it alleged that the improper means was the breach itself).

[49] Though Tank argues otherwise, the Court assumes *arguendo* that Tank knew of the contract and induced Whalen and Ducotey to breach it.

[50] *Bishop & Assocs.*, 520 S.W.3d at 472.

Ducotey to breach their nondisclosure agreements. But that is not an *independently* wrongful act; it is the breach induced itself. And without the independently wrongful act, Tank did not employ improper means to induce Whalen or Ducotey to breach their nondisclosure agreements.[51]

CST's cited cases do not alter the Court's conclusion. CST offers *CGB Diversified Services, Inc. v. Baumgart* to show that "[c]ourts have found that aiding the violation of restrictive covenants constitutes independently wrongful actions sufficient to state a claim for tortious interference."[52] Courts have made that finding, but those cases are not binding, and in any event, this Court disagrees them. *CGB Diversified* relied on (and CST also cites) *Blueline Rental, LLC v. Rowland*, which held that encouraging an employee to "violate . . . their restrictive covenants" is "wrongful," and thus supported a finding of improper means.[53] But *Blueline* relied on inapposite cases that characterized such encouragement as "an unlawful act" for a claim of civil conspiracy, not for tortious interference.[54] Encouraging an employee to breach his restrictive covenant might be an underlying unlawful act sufficient to support a civil-conspiracy claim, but it is not the *independently* wrongful act required for tortious interference with a contract. Taking "unlawful act" out of context, *Blueline Rental* conflated the wrongful act required for civil conspiracy and the independent wrongful act required for tortious interference.

---

[51] *EnviroPAK Corp.*, 2015 WL 331807, at *8 (finding that plaintiff failed to state a claim when it alleged that the improper means was the breach itself); Restatement (Third) of Torts, § 17 cmt. e (Am. L. Inst. 2020) ("The wrong in such a case may be described as 'independent' to emphasize that the conduct was wrongful apart from its effect on the plaintiff's contract.").

[52] 504 F. Supp. 1006, 1024 (E.D. Mo. 2020).

[53] No. 18-cv-00195, 2020 WL 1915252, at *4 (E.D. Mo. Apr. 20, 2020).

[54] *See Prop. Tax Representatives, Inc. v. Chatam*, 891 S.W.2d 153, 160 (Mo Ct. App. 1995) (finding that parties conspired to perform "unlawful act" of breaching restrictive covenants and in pursuance of that, co-conspirator did "unlawful act" of encouraging employee to breach); *Schott v. Beussink*, 950 S.W. 2d 621, 628 (Mo. Ct. App. 1995) (finding that "[i]ndividuals associating for the purpose of causing or inducing a breach of contract is a basis for an unlawful conspiracy").

The Court concludes that CST has failed to show a genuine dispute of material fact that Tank acted without justification. That is so because it has not offered evidence that Tank employed improper means—by committing some independently wrongful act—to induce Whalen or Ducotey to breach their nondisclosure agreements. CST's claim against Tank for tortious interference with contract therefore fails as a matter of law. The Court grants summary judgment for Tank.

### B. Tortious Interference with a Business Expectancy (against Tank and LaForge)

CST brings a claim for tortious interference with a business expectancy against both Tank and LaForge. Tank and LaForge move for summary judgment on this claim; CST crossmoves for summary judgment. Under Missouri law, a claim of tortious interference with business expectancy overlaps with the claim of tortious interference with contract, so the elements are the same except the business relationship that the defendant interferes with.[55] To prevail, a plaintiff must show "(1) . . . a valid business expectancy; (2) defendant's knowledge of the . . . relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages."[56] Tank and LaForge argue that they are entitled to summary judgment because CST has failed to make its required showing on the first, third, and fourth elements. The Court agrees that CST has failed to show a genuine dispute of material fact

---

[55] In fact, Missouri law sometimes characterizes these claims as species of the more general tort "tortious interference with business relations." *Creative Compounds, LLC v. ThermoLife Int'l, LLC*, 669 S.W.3d 330, 340 (Mo. Ct. App. 2023) (internal quotation marks omitted) (quoting *Rail Switching Servs., Inc. v. Marquis-Missouri Terminal, LLC*, 533 S.W.3d 245, 257 (Mo. Ct. App. 2017)). And though at one point, Missouri law gave more protection to contracts than business expectancies by eschewing the improper-means requirement for interference with a contract, Missouri law has changed course. It now requires improper means for each claim. *See Clinch v. Heartland Health*, 187 S.W.3d 10, 16 (Mo. Ct. App. 2006) ("Courts since *Nazeri* [*v. Mo. Valley Coll.*, 860 S.W.2d 303 (Mo. 1993)] have interpreted that case to mean that plaintiffs must allege and prove in all tortious interference cases that the defendant employed improper means." (citing *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1, 14 (Mo. Ct. App. 2002))).

[56] *Rail Switching Servs.*, 533 S.W.3d at 257 (quoting *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 250 (Mo. 2006)).

that it had a valid business expectancy.  The Court grants summary judgment for Tank and LaForge on the claim for tortious interference with business expectancy.

To be a valid business expectancy, an expectancy must be "reasonable and valid under the circumstances alleged."[57]  Otherwise, "there was nothing for [the defendant] to have interfered with."[58]  And those circumstances must show at least "a probable future business relationship that gives rise to a reasonable expectancy of financial benefit."[59]  The financial benefit may be the award of a contract or some "other economic benefit."[60]  A "regular course of prior dealings" supports a reasonable expectancy.[61]  Because the tortfeasor must have interfered with a valid business expectancy, the expectancy must be valid—and thus reasonable and valid under the circumstances—at the time of the alleged interference.[62]  Therefore, the validity of the expectancy is measured at the time of the interference.

CST argues that it had a valid business expectancy that it would be awarded the subcontract for the Byrd Park Project.  CST obfuscates exactly who this business expectancy was with—the City or Crowder.  In the Pretrial Order, CST claimed that Tank and LaForge interfered with CST's business expectancy not with Crowder but "with the City of Richmond regarding the Byrd Park Project."[63]  CST's briefing sheds no light on whether it views the business expectancy as with Crowder or the City, except that it offers that it had an expectancy to work with the City

---

[57] *Creative Compounds,* 669 S.W.3d at 341 (internal quotation marks omitted) (quoting *Rail Switching Servs.*, 533 S.W.3d at 260).

[58] *Id.* (internal quotation marks omitted) (quoting *Rail Switching Servs.*, 533 S.W.3d at 260).

[59] *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 19 (Mo. 2012) (internal quotation marks omitted) (quoting *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 250 (Mo. 2006)).

[60] Restatement (Third) of Torts, § 18 cmt. d (Am. L. Inst. 2020).

[61] *Id.* (citing *Sloan v. Bankers Life & Cas. Co.*, 1 S.W.3d 555, 565 (Mo. Ct. App. 1999)).

[62] *See Creative Compounds*, 669 S.W.3d at 341 (explaining that without a valid business expectancy, a defendant had nothing to interfere with).

[63] Doc. 397 at 28.

and Crowder.  Regardless, the Pretrial Order controls the course of litigation,[64] and it is clear:
CST claims a business expectancy with the City, not with Crowder.

This distinction matters because to have a valid business expectancy, CST must show that
it had some "reasonable expectancy of financial benefit," and that necessarily raises the issue of
who would be conferring the financial benefit—here, the subcontract.[65]  CST did not have a
reasonable expectation of being awarded the subcontract from the City.  That is because the City
did not have the responsibility of awarding the subcontract; Crowder did.  Though CST is correct
that the expectancy need not be the award of a future contract, CST itself has chosen to
characterize the expectancy here as the award of a future contract.  And CST offers no evidence
that the City would award the contract or otherwise require the bidding general contractors to
award the subcontract to CST.  To the contrary, the undisputed facts show that, though the City
had previously worked with CST, and though it was pleased with that work, it named two other
prequalified manufacturers to prompt a competitive bid process.[66]

CST, though it bears the burden to show evidence sufficient to survive summary
judgment, offers no case where a Missouri court has extended the business-expectancy
relationship to a third party—to one who does not actually confer the financial benefit.  The
cases it cites address business expectancies between a bidder and the one awarding the bid,
which is a relationship analogous to that between CST and Crowder, not CST and the City.

_____

[64] Doc. 397 at 1; *see Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1202 (10th Cir. 2017) (explaining that because the pretrial order governs the course of litigation, "it is difficult to see how the district court abused its discretion in confining the issues to those in the pre-trial order").

[65] *See CIBC Bank USA v. Williams*, 669 S.W.3d 298, 310 (Mo. Ct. App. 2023) (finding that plaintiff sufficiently alleged business expectancy where plaintiff's former customers paid fees to plaintiff); *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 862 (8th Cir. 2010) (determining existence of valid business expectancy by asking "whether [plaintiff] had independent business relationships" with its dealers, who paid plaintiff for equipment); *Tri State HDWE. Inc. v. John Deere Co.*, 561 F. Supp. 2d 1064, 1077–78 (W.D. Mo. 2008) (considering whether plaintiff had business expectancy with party who would buy dealership from plaintiff).

[66] *See* Doc. 482-8 at 2.

*Kennedy v. Kennedy* addresses a defendant's tortious interference between the seller and buyer of real estate.[67]  And *American Business Interiors, Inc. v. Haworth, Inc.* instructs that "the prospect of winning a bid may constitute a reasonable expectancy."[68]  True enough, but that case addresses a defendant's tortious interference between a bidder and the customer soliciting bids— not a subbidder, bidder, and bid-soliciting customer as here.

CST has failed to show that it had a valid business expectancy with the City.  Tank and LaForge are therefore entitled to judgment as a matter of law.  The Court grants summary judgment to Tank and LaForge on the claim for tortious interference with a business expectancy.

### C.  Unfair Competition (against Tank, LaForge, and Crowder)

CST sues both Tank, LaForge, and Crowder for unfair competition.  Under Missouri law, unfair competition arises when a defendant engages in deceptive marketing—in other words, it "pass[es] off or attempt[s] to pass off, on the public, the goods or business of one person as and for the goods or business of another."[69]  A claim for unfair competition based on deceptive marketing requires that a defendant make  (1) a "representation relating to the actor's own goods, services, or commercial activities," (2) "that is likely to deceive or mislead prospective purchasers," (3) "to the likely commercial detriment of [plaintiff]."[70]  But for an unfair-competition claim based on deceptive marketing, the representation must attempt to deceive another into believing that the defendant's own services are actually those of another business or

---

[67] 819 S.W.2d 406, 408–09 (Mo. Ct. App. 1991).

[68] 798 F.2d 1135, 1142 (8th Cir. 1986).

[69] *Nat'l Motor Club of Mo., Inc. v. Noe*, 475 S.W.2d 16, 19 (Mo. 1972).

[70] Restatement (Third) of Unfair Competition § 2 (Am. L. Inst. 1995); *Am. Equity Mortg., Inc. v. Vinson*, 371 S.W.3d 62, 64–65 (Mo. Ct. App. 2012) (noting that Missouri law is "in accord" with section 2 of the Restatement (citing *Noe*, 475 S.W.2d at 19–20)).

approved by the other business.[71]  But if the "representations relat[e] solely to the . . . services marketed by others," then the claim fails.[72]

Tank, LaForge, and Crowder move for summary judgment on the unfair competition claims against them.  The Court first addresses the claim against Tank and LaForge, and then the one against Crowder.

### 1.  Tank and LaForge

CST's unfair-competition claim against Tank and LaForge relies on two theories: (1) deceptive marketing[73] and (2) Tank's improper acquisition and use of CST's business information.  On the first basis, CST argues that Tank deceptively marketed its services by making misrepresentations about Ducotey's experience in his summary of experience.  And LaForge, CST argues, misrepresented Ducotey's experience because he compiled the Qualifications Package and helped with the clarification letter.  Tank and LaForge respond that they did not misrepresent Ducotey's experience.  On the second basis, CST argues that Tank improperly obtained CST's business information through Ducotey and Whalen.  CST fails to demonstrate a genuine dispute of material fact on either theory.

---

[71] *Am. Equity*, 371 S.W.3d at 64.

[72] Restatement (Third) of Unfair Competition § 2 cmt. c (Am. L. Inst. 1995) (explaining that representations solely about another's services do not fall under deceptive marketing).

[73] Though CST does not explicitly label this theory as deceptive marketing, it relies on law addressing unfair-competition claims for deceptive marketing.  *See* Doc. 482 at 26 (first citing Restatement (Third) of Unfair Competition § 2 (Am. L. Inst. 1995) (setting out requirements for deceptive-marketing claim); and then citing *Quickdine.com, Inc. v. Doordash, Inc.*, No. 18-CV-3401, 2019 WL 13210592, at *2 (W.D. Mo. Feb. 2019) (finding that plaintiff stated a claim for deceptive marketing)).  It further cites *Sale Resource, Inc. v. Alliance Foods, Inc.*, No. 08cv0732, 2009 WL 2382365 (E.D. Mo. July 30, 2009), which notes that the Restatement features a residual clause that permits unfair-competition claims for "acts or practices" that are "actionable" under the common law.  That is true, but CST does not develop any argument that the summary of experience was actionable except as deceptive marketing.

### a) Deceptive Marketing by Tank and LaForge

CST fails to identify evidence of deceptive marketing through a misrepresentation by Tank or LaForge attempting to pass CST's services off as its own. CST explains that Tank used Ducotey's summary of experience to gain approval as an "or equal" manufacturer for the Byrd Park Project, and when it submitted bids for other projects. As for the Byrd Park Project, CST focuses first on the Qualifications Package and then on Tank's clarification letter. The Qualifications Package submitted as part of Tank's submittal for approval as an "or equal" manufacturer includes four pages that feature Ducotey's summary of experience, which includes pictures of previous projects Ducotey was associated with while at CST. The pictures showed a handful of CST projects that Ducotey was involved with while employed there: projects in San Rafael, Summerland, Rancho Bernardo, and Gainesville. But nowhere does the summary of experience explicitly claim those projects to be Tank projects.

CST suggests that the mere inclusion of the photos suggested that the projects were Tank, not CST, projects. To the contrary, the written statements in Ducotey's summary suggest that they are CST projects. Ducotey's summary explains that he was employed by CST and Conservatek (one of CST's acquisitions), noted his previous position at CST (Vice President of Engineering) and his various job responsibilities there, and then listed his accomplishments, many of which were with Conservatek and CST. Following those statements, the summary attaches the pictures of the CST projects. When those pictures are viewed in the context of statements about Ducotey's CST experience, no reasonable jury could find that Tank represented those projects as its own, simply by including them in the summary. In fact, when following up

on the request, the City showed that it understood that Ducotey "ha[d] *CST* past experience . . . with triangulated, rectangular flat, column supported roofs."[74]

CST also argues that Tank's clarification letter misrepresented Ducotey's experience. Following the submission of the Qualifications Package, Crowder sent a few inquiries to Tank. One of those was whether Tank had experience with triangulated, rectangular, flat, column supported roof systems.[75] Tank responded with a clarification letter.  It explained that Ducotey had "been involved with/over saw the design and manufacture" of similar projects thought his career.  It then listed six of Ducotey's projects in addition to the four initially included in the summary of experience: Huntington Park, Colorado Springs, Alpine, Laurel, Norfolk, and Camillus.  Tank further clarified that Ducotey had worked on or oversaw those projects "while working for CST Covers/Conservatek as their VP of Engineering (As recently as 2016)."[76]  CST may be right that these statements misrepresented Ducotey's experience; he did not, after all, work on some of the projects while he was at CST.  But nowhere does the clarification letter attempt to pass the CST projects off as Tank's own projects.  And without some representation that the projects were Tank's, not CST's, projects, Tank did not "attempt[] to pass off, on the public, the . . . business of one person as . . . [the] business of another."[77]

CST also argues that the Ducotey summary of experience was used by Tank to procure other projects.  But the same problem noted above remains: the summary of experience does not pass off the projects as Tank's. Tank submitted the summary of experience to projects in Honouliuli, Las Vegas, Albuquerque, and Wellington.  But for these submissions, Tank used

---

[74] Doc. 483-9 at 2 (emphasis added).

[75] *Id.*

[76] Doc. 420-16 at 24–25.

[77] *Nat'l Motor Club of Mo., Inc. v. Noe*, 475 S.W.2d 16, 19 (Mo. 1972).

similar materials to the Byrd Park Project, which, as explained above, made no representations attempting to pass off the CST projects as Tank's own.

CST has therefore failed to show a genuine dispute on an essential element of its deceptive-marketing claim—that Ducotey's summary made a misrepresentation that attempted to pass off CST's services as Tank's own.  Because it fails to make that required showing, CST's unfair-competition claim based on deceptive marketing fails as a matter of law.

### b)  Tank's Improper Acquisition of CST's business information

As the next basis for its unfair-competition claim, CST claims that Tank[78] encouraged its employees to use CST's confidential business information—specifically, its "CST-owned designs, drawings, and manuals."[79]  But CST has not met its burden to show that this conduct is actionable under Missouri law.  CST cites no Missouri state law for support of its legal theory. Instead, it relies on Section 1 of the Restatement (Third) of Unfair Competition, which permits a residual category of unfair-competition claims for "acts or practices" that are "actionable" under state statute or "general principles of common law."[80]  But once more, CST cites no Missouri law that makes use of confidential information actionable as common-law unfair competition; it only points out that section 759 of the 1939 Restatement (First) of Torts imposes liability for obtaining business information through improper means.  First, CST has not shown that Missouri imposes liability in accordance with section 759.  The only support it offers is a 1945 case from the Eighth Circuit, *Sandlin v. Johnson*, which at most holds that section 759 "may" support

---

[78] CST does not include LaForge in this claim.  *See* Doc. 397 at 29.

[79] *Id.*

[80] Restatement (Third) of Unfair Competition § 1 (Am. L. Inst. 1995).

"liability"; but that case says nothing about whether Missouri has adopted such liability.[81]

Second, CST appears to contend that Tank's obtaining CST's business information through

improper means serves as the basis for its unfair-competition claim.  But, as explained above,

CST has brought forth no evidence that Tank used improper means to obtain any of CST's

business information.  This final basis for the unfair-competition claim fails.

CST has failed to show a dispute of material fact on its unfair-competition claim.  On the

deceptive-marketing basis, it has offered no evidence of a misrepresentation attempting to pass

of CST's services as Tank's own.  On the business-information basis, it has offered no evidence

that Tank obtained the information through improper means, let alone that obtaining business

information can serve as the basis for an unfair-competition claim under Missouri law.  Tank and

LaForge are therefore entitled to summary judgment on the unfair-competition claims against

them.

### 2.  Crowder

Both CST and Crowder move for summary judgment on the unfair-competition claim.

CST's only theory for unfair competition against Crowder is deceptive marketing.  Crowder

argues that CST has failed to produce evidence of the first and third elements—Crowder neither

made a representation about its own services nor diverted trade or affected CST's goodwill.  CST

argues that it has produced evidence on each element: Crowder made a representation about its

own services by telling the City that it had investigated Tank's qualifications; that representation

deceived the City; and it caused (1) CST to lose the subcontract/agreement to Tank and (2)

---

[81] CST cites a treatise, Melvin F. Jager & Brad Lane, *Trade Secrets Law* § 7:22 (2024 ed.), which notes that "Missouri . . . follows Section 759 of the Restatement."  The treatise relies on *Sandlin* for that proposition, which the Court finds unpersuasive for the reasons explained above.

injured CST's reputation with the City.  The Court agrees with Crowder on the first element, so CST's unfair-competition claim fails as a matter of law.

CST's argument runs into the same problem as its claim against Tank: it has not shown that Crowder made a misrepresentation attempting to pass CST's services off as Tank's own.  As explained above, a claim for deceptive marketing requires that the representation, though relating to the defendant's own services, attempts to deceive another into believing that the defendant's own services are actually those of another business or approved by the other business.[82]

CST begins its brief by conceding almost the whole ball game.  Shifting from its argument earlier in this litigation that based its unfair-competition claim on Crowder's representations about *Tank's* services, CST now argues that Crowder made a misrepresentation about *its own* services.  That service, according to CST, was Crowder's promise to investigate and certify Tank's qualifications as a possible subcontractor substitution.  So, CST's argument goes, when Crowder represented that it had investigated Tank's technical qualifications[83] —but actually had not—it made a misrepresentation.

In making that audible, CST fumbles the claim.  First, it is not clear that certification of qualifications is properly characterized as Crowder's business or service.  But the more fundamental flaw in CST's argument is this: CST has offered no evidence that Crowder attempted to pass off its certification service as CST's or vice versa.  CST does not even identify evidence that CST offers these "certification" services.  Crowder did not, for example, have CST perform the certification and then attempt to pass off CST's certification as Crowder's own.  Nor

---

[82] *See, e.g.*, *Am. Equity Mortg., Inc. v. Vinson*, 371 S.W.3d 62, 64 (Mo. Ct. App. 2012).

[83] Crowder contends that it only promised to review Tank's logistical qualifications (e.g., could Tank post the bond, could Tank perform the work on schedule) and left the City's engineers to evaluate Tank's technical qualifications.  This dispute is immaterial, however, because CST still has offered no evidence that Crowder deceptively marketed this certification service.

did the opposite occur: Crowder did not perform the certification itself and then pass it off as performed by CST. So Crowder's representation was not deceptive marketing; it did not attempt to "caus[e] the mistaken belief" that its certification "[was] the business of" CST or that its certification was "produced, sponsored, or approved by" CST.[84] CST's attempt to recast an allegedly false statement—that Crowder had investigated Tank's qualifications—into deceptive marketing is unavailing.

CST has failed to meet its summary-judgment burden. No genuine dispute of material fact exists on the unfair-competition claim and Crowder is entitled to judgment as a matter of law on it. The Court grants summary judgment for Crowder on the unfair-competition claim.

### D. Civil Conspiracy (Tank and Crowder)

CST brings claims for civil conspiracy against both Tank and Crowder. Civil conspiracy is not a standalone claim; it is a theory of joint and several liability.[85] So first, the plaintiff must show that "one of the alleged conspirators" committed some underlying tortious act.[86] If the plaintiff fails at this step, "then the conspiracy claim fails as well."[87] And then, to impose joint and several liability on another alleged conspirator, the plaintiff must show the elements of a civil conspiracy: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of

---

[84] *Am. Equity*, 371 S.W.3d at 64; *see also Quickdine.com, Inc. v. Doordash, Inc.*, No. 18-CV-3401, 2019 WL 13210592, at *2 (W.D. Mo. Feb. 21, 2019) ("[A] claim for unfair competition is 'established by showing that one party is 'passing off' his product as that of another so that the public is deceived regarding the source of the goods.'" (quoting *Bass Buster, Inc. v. Gapen Mfg., Co.*, 420 F. Supp. 144, 160 (W.D. Mo. 1976))).

[85] *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 22 (Mo. 2012) ("[C]ivil conspiracy . . . is not a separate and distinct action. '[R]ather, it acts to hold the conspirators jointly and severally liable for the underlying act.'" (alteration in original) (citations omitted)).

[86] *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 10CV645, 2011 WL 6091722, at *2 (E.D. Mo. Dec. 7, 2011) (citing *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. Ct. App. 2008)).

[87] *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. 1999) (citing *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. 1996)).

the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff was thereby damaged."[88]

CST bases its civil-conspiracy theory on the unfair-competition claims. In other words, it seeks to impose joint and several liability on Crowder for Tank's act of unfair competition and to impose joint and several liability on Tank for Crowder's act of unfair competition. But, as discussed above, CST has failed to show a genuine dispute of material fact that Tank or Crowder engaged in unfair competition. CST thus fails to make its required showing on the first step of imposing civil-conspiracy liability—an underlying tortious act. And without that showing, CST's civil-conspiracy claims fail as a matter of law. The Court grants summary judgment on CST's civil-conspiracy claims against Tank and Crowder.

**IT IS THEREFORE ORDERED BY THE COURT** that Crowder's Motion for Summary Judgment (Doc. 398) and Tank and LaForge's Motion for Summary Judgment (Doc. 416) are **granted**. CST's Motion for Partial Summary Judgment (Doc. 411) is **denied**.

**IT IS FURTHER ORDERED** that CST's Motion to Correct its Motion for Partial Summary Judgment (Doc. 499) is **moot**. CST's Motion to Strike Crowder's Reply (Doc. 525) is **moot**.

**IT IS SO ORDERED.**

Dated: April 9, 2025

                                        S/ Julie A. Robinson
                                        JULIE A. ROBINSON
                                        UNITED STATES DISTRICT JUDGE

---

[88] *Id.*